N. BLOOM & SON (ANTIQUES) LIMITED and Tyler & Co., individually and as agent for Lloyd's Underwriters, Plaintiffs,

v.

Carolyn SKELLY, Defendant.

No. 86 Civ. 1196 (MGC).

United States District Court, S.D. New York.

Nov. 23, 1987.

---

Friedman, Leeds, Shorenstein & Armenakis, New York City by Paul H. Appel, for plaintiffs.

Shea & Gould, New York City by Martin H. Samson, for defendant.

## OPINION

CEDARBAUM, District Judge.

This is a diversity action brought by a British antiques dealer and its insurer to recover from an American customer for breach of contract. After carefully considering the documentary evidence and the testimony and credibility of the witnesses presented at the bench trial, I make the following findings of fact and conclusions of law.

## THE FACTS

*Parties and Witnesses*

Plaintiff N. Bloom & Son (Antiques) Limited is a dealer in antique jewelry and silver and has its place of business in London, England. Plaintiff Tyler & Co. is a British corporation which was authorized to act as agent for Lloyd's Underwriters, a British insurance underwriting organization. Defendant Carolyn Skelly is an individual who resides in the United States. Ian Harris is the managing director and a one-third owner of Bloom. Giles Swarbreck was employed by Bloom as a salesman until November 1985, when he became sales director. All of the purchases at issue were arranged for by Skelly during visits to London.

*First Claim for Relief*

In late November or early December 1984, Skelly agreed to purchase from Bloom a 1940's cabochon emerald and diamond platinum-mounted fringe necklace ("Cabochon necklace") for 280,000 British pounds and a deco diamond suite mounted in platinum consisting of a bracelet, necklace and double chip brooch ("Diamond suite") for an additional 120,000 British

pounds. Skelly signed a receipt dated November 29, 1984, which identified the two items. Immediately above her signature on the receipt appeared the following language: "I have agreed to buy and have taken delivery of the above items in good condition and I undertake to instruct my bank on or before the 14th of December 1984 to pay for them . . ." In late November or early December 1984, Swarbreck flew to the United States, where he personally delivered both the Cabochon necklace and the Diamond suite to Skelly.

On about December 13, 1984, the day before she was to pay for this merchandise, Skelly had a conversation with Swarbreck concerning both the Cabochon necklace and the Diamond suite. Skelly told Swarbreck she was returning the Cabochon necklace to Bloom because she found it too heavy and not becoming to her. She paid in full for the Diamond suite, and had the Cabochon necklace delivered to Bloom, which received it in good condition on January 14, 1985.

A statement Bloom sent to Skelly of her balance due as of August 31, 1985, did not reflect any amount due for the necklace. None of Bloom's business records prepared between December 13, 1984, and October 21, 1985, reflect the sale of the Cabochon necklace to Skelly, nor did it send her any bill for the necklace during this period. Two of its business records, its sold ledger and customer cards, reflect that this sale was "cancelled."

Bloom claims that Skelly is liable for breach of a contract to buy the Cabochon necklace.

*Second Claim for Relief*

On about August 9, 1985, Skelly agreed to purchase from Bloom two silver gilt candelabras and a silver gilt centerpiece for $45,000. As part of this agreement, Bloom was to deliver these goods to Skelly's house in Newport, Rhode Island.

Bloom's preprinted invoices contain the following language:

The title and the goods on this invoice do not pass until they have been paid for in full and, if they are sold before they have been paid for, then N. Bloom & Son (Antiques) Ltd., has the right to the proceeds of the sale. Unless otherwise stated on this invoice, the full amount owing shall be paid within 30 days of the invoice date and any sums not paid by that date or alternative date agreed in writing shall bear interest from the invoice date at the rate of two percent each whole or part calendar month until paid.

Skelly had seen a preprinted form containing this language.

Bloom retained Artworld Shipping Ltd. to deliver the centerpiece and candelabras to Skelly. In September 1985, Artworld made several attempts to deliver the candelabras and centerpiece to Skelly at a house she owns in Newport, but on each occasion Skelly was not there. According to Skelly, no one was authorized on her behalf to receive or take possession of such items. Although Artworld left written notices of its attempts to make delivery, Skelly took no action to arrange a time for delivery when she would be in the house. Skelly never received or took possession of the merchandise.

On about October 1, 1985, Skelly instructed Artworld's agent, Braun's Express Inc., to return the candelabras and centerpiece to Bloom in London. On about October 18, 1985, Skelly had a telephone conversation with Harris in which she informed him that she was returning the candelabras and centerpiece to Bloom, and that she had instructed Braun's Express Inc. to transport them to Bloom in London at her expense. I accept as credible the testimony of Harris and the deposition testimony of Swarbreck that Bloom did not agree to the return of this merchandise.

Skelly testified that her reason for returning the merchandise was that a New York appraiser, to whom she had sent photographs of the candelabras and centerpiece, had informed her that they were worth less than she had agreed to pay and that they did not constitute a matched set. In testimony which I do not find credible, Skelly testified that Harris and Swarbreck had originally told her that these objects constituted a set or suite, of the same date

and kind, that belonged together. The invoice prepared by Bloom on August 9, 1985, in connection with this transaction and received by Skelly, contained the following description:

B 312–A

Large Silver gilt victorian candelabra 1839/45 by John Charles Edington, London

141293A

Large victorian silver gilt centerpiece/candelabra by Mortimer and Hunt, London. 1840 16 oz.

Export $45,000

Bloom contends that Skelly owes $45,000 for breach of her agreement to purchase the candelabras and centerpiece. Bloom also seeks recompense for its $499.85 cost of transporting the candelabras and centerpiece from Newport to London.

*Third Claim for Relief*

On about August 9, 1985, at the same time that she purchased the candelabras and centerpiece, Skelly was given possession by Bloom of a Van Cleef and Arpels necklace and bracelet watch. Although Skelly doubted that she was also given possession of a lapis lazuli bracelet, I find as a fact that she was. I base this finding on the testimony of Harris and Swarbreck, and on the fact that Skelly signed a document, discussed below, stating that she had received all three items. At the time she took possession of these items, Skelly was not obligated to purchase them.

At the time she took possession, Skelly signed a document (the "Approval Note") dated August 9, 1985, which provided in part:

These goods are delivered on the express condition that they remain the property of N. Bloom & Son (Antiques) Ltd. until paid for within 20 days or any other specific period as agreed between the parties in writing. You, in the meantime, being responsible for loss or damage ...

THESE GOODS REMAIN OUR PROPERTY UNTIL PAID FOR
B030T

Suite of necklace and bracelet by Van Cleef and Arpels cabochon, sapphire and diamond: 18 ct. Yellow Gold

39,500

B97305
18 ct. Yellow Gold and Lapis Lazuli bracelet

2400

The figures appearing on the Approval Note were in British pounds. Skelly has admitted knowing the entire contents of the Approval Note at the time she signed it.

The Van Cleef and Arpels necklace and the lapis lazuli bracelet were stolen from Skelly after her return to the United States. In September 1985, after Skelly had notified Bloom of the theft, Skelly, with Bloom's consent, returned the Van Cleef and Arpels watch bracelet to Bloom. The bracelet was delivered to and accepted by Swarbreck while he was at Skelly's house in Newport.

On about September 30, 1985, Skelly orally asked Harris to return the Van Cleef and Arpels watch bracelet to her. During this telephone conversation, Harris agreed to send the watch bracelet to Skelly in exchange for her promise to pay $36,000 upon receipt of the watch bracelet, as payment for both the Van Cleef and Arpels necklace and the watch bracelet. In addition, although Skelly never admitted having received the lapis lazuli bracelet, Bloom understood that the $36,000 would cover that item as well. Bloom sent the watch bracelet back to Skelly on October 2, 1985. Bloom also sent Skelly an invoice billing her the sum of $36,000. Skelly wrote, on a Bloom invoice dated September 16, 1985:

Send chks [checks] for 25,000 on receipt of watch in N.Y. should be U.S. dollars equal to 25,000

The parties have stipulated that this reflected a promise to pay $36,000. Skelly did not send the checks, and never paid Bloom for this transaction, although she kept the watch bracelet.

Harris wrote a letter to Skelly dated October 22, 1985, which stated in part:

[S]ince you have broken your agreement to pay us for the jewelry immediately you received the watch back, and which has now been in your possession for well over a week, we require you to pay the sum which was originally agreed which was shown on the approval note . . ., ie, 39,500 [British pounds] for the VC & A suite and 2,400 [British pounds] for the gold and lapis-lazuli bracelet, and I enclose an additional invoice for 16,900 [British pounds], being the balance of 14,500 [British pounds] on the VC & A suite plus 2,400 [British pounds] for the bracelet.

On August 9, 1985, prior to the time it gave Skelly possession of this jewelry, Bloom obtained insurance coverage for losses it might sustain as a result of theft or loss arising out of Skelly's possession. The policy included the following provision:

*No Recourse Clause (Private Customers)*

Limit 10,000 any one customer and it is agreed to amend the definition of 'Private Customers' to mean any person unconnected with the jewelry, silver or precious stone trade.

Bloom claimed and recovered 17,824 British pounds under this policy for the theft of the Van Cleef and Arpels necklace and the lapis lazuli bracelet from Skelly. The claim was paid by Lloyd's Underwriters. Tyler & Co. acted as agent for Lloyd's Underwriters.

Bloom's recovery from Lloyd's was based on the figures and entries contained in an invoice dated September 30, 1985, concerning this transaction. This invoice set the price of the Van Cleef and Arpels necklace and watch bracelet at $31,000. Bloom recovered $20,667, or two-thirds of the $31,000, for the Van Cleef and Arpels necklace, and $5000 for the lapis lazuli bracelet.

Bloom and Tyler claim that Skelly owes them the amount set forth on the Approval Note for these items.

## DISCUSSION

*First Claim For Relief*

■ Although Skelly initially agreed to purchase the Cabochon necklace, Bloom ac-

cepted the return of the item. From January to October 1985, or until relations between the parties began to sour, Bloom never objected to the return, and never informed Skelly that it was holding the necklace on her behalf. I find as a fact, from the conduct of the parties, that they agreed to rescind the contract of sale.

The parties, who have stipulated that the New York Uniform Commercial Code applies to this case, have not cited any New York decisions in which this issue has been addressed. But it has been held in other U.C.C. jurisdictions that a seller who unequivocally accepts the return of goods extinguishes any obligation owed by the buyer. *Marsh v. Orville Carr Associates, Inc.,* 433 S.W.2d 928, 931 (Tex.Civ.App. 1968), *writ ref. n.r.e., quoting* 2 Black, *Rescission and Cancellation* § 531, pp. 1251–52; *see also Volk v. Kendall,* 71 Ill. App.3d 211, 27 Ill.Dec. 633, 635, 389 N.E.2d 697, 699 (1979); R. Nordstrom, *Law of Sales* § 114 (1970). Therefore, Bloom can recover no damages resulting from Skelly's failure to purchase the Cabochon necklace.

*Second Claim for Relief*

■ Skelly contends that she never accepted the candelabras and centerpiece, and that instead she rejected them. This distinction affects the measure of damages. The measure of damages in a case of nonacceptance is the difference between the contract price and the market price at the time and place of tender, or lost profits. N.Y.U.C.C. § 2–708. In a case in which goods are accepted but not paid for, the seller may bring an action for the full contract price. N.Y.U.C.C. § 2–709(1)(a).

N.Y.U.C.C. § 2–507(1) provides:

Tender of delivery is a condition to the buyer's duty to accept the goods and, unless otherwise agreed, to his duty to pay for them. *Tender entitles the seller to acceptance of the goods and to payment according to the contract.* [emphasis added]

The requirements for an effective tender are set forth in § 2–503(1):

Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery. The manner, time and place for tender are determined by the agreement and this Article, and in particular

(a) tender must be at a reasonable hour, and if it is of goods they must be kept available for the period reasonably necessary to enable the buyer to take possession ...

Bloom, through Artworld, attempted on several occasions to deliver the candelabras and centerpiece to Skelly's home in Newport, as the parties had agreed. Although Skelly herself was not present when tender was made, she could have authorized someone else to accept delivery on her behalf. She could also have responded to the notices left by Artworld, in order to arrange a time for delivery when she would be present. She did neither because she had decided not to accept delivery. Since Bloom made proper tender of the goods pursuant to § 2–503(1), it is entitled to acceptance pursuant to § 2–507(1).

Acceptance is also governed by § 2–606(1), which provides:

Acceptance of goods occurs when the buyer ...

(b) fails to make an effective rejection (subsection (1) of Section 2–602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them ...

Section 2–602(1) mandates that "[r]ejection of goods must be within a reasonable time after their ... tender." The determination of what constitutes a reasonable time period depends on the particular circumstances of each case and is generally a question of fact. *Sherkate Sahami Khass Rapol v. Henry R. Jahn & Son, Inc.*, 701 F.2d 1049, 1051–52 (2d Cir.1983); *Shokai Far East Ltd. v. Energy Conservation Systems, Inc.*, 628 F.Supp. 1462, 1466 (S.D.N.Y. 1986). In this case, Skelly, after being informed of Artworld's attempts to deliver the candelabras and centerpiece throughout September 1985, did not take any active steps to reject them until October 1. Under the circumstances, this was not within a "reasonable time" after tender under § 2–602(1). During the month of September 1985, Skelly did have a "reasonable opportunity to inspect" the goods under § 2–606(1). Skelly proffered no good reason for her repeated failure to take delivery of the goods. Had she done so, an inspection could have been accomplished in a matter of minutes.

Skelly's argument that she cannot be held to have accepted the goods because she did not inspect them, as she has a right to do under N.Y.U.C.C. § 2–513, is untenable. Section 2–513(1), like the N.Y.U.C.C. provisions discussed above, provides a right of inspection "at any reasonable place and time and in any reasonable manner." This provision does not mean that if a buyer chooses not to inspect the goods, she thereby acquires a defense of non-inspection. By refusing to respond to Artworld's repeated attempts at delivery, Skelly gave up her right of inspection, and thus accepted the goods. Under N.Y.U.C.C. § 2–709(1)(a), the amount Bloom may recover is therefore the full contract price of $45,000.

*Third Claim for Relief*

1. *The $36,000 Agreement*

The parties disagree about how to characterize the agreement between Bloom and Skelly that settled on the new $36,000 figure. When Skelly returned the watch bracelet to Bloom, Bloom accepted it through its agent Swarbreck. On September 30, 1985, the parties made a new oral agreement, under which Skelly would purchase the watch bracelet and would pay $36,000 immediately upon its receipt. The $36,000 was to cover the watch bracelet, the stolen necklace and the disputed lapis lazuli bracelet.

I find that Bloom's offer to reduce the amount Skelly owed was made on the express condition that Skelly would pay the $36,000 immediately upon receipt of the watch bracelet. My finding is based on the credible trial and deposition testimony of Harris and Swarbreck. It is also based on the confirmatory notation made by Skelly

herself, which states that checks should be sent "on receipt of watch in N.Y."

■ Thus, although under the U.C.C. an offer can generally be accepted by a promise to perform, N.Y.U.C.C. § 2–206, in this case the language and circumstances "unambiguously indicated" that the offer could only be accepted by Skelly's prompt payment of the $36,000, *id.* Since Skelly did not pay promptly, indeed, did not pay at all, Bloom was entitled to withdraw the offer and to hold Skelly to the 41,900 British pounds to which she had agreed when she signed the Approval Note.

### 2. *The No–Recourse Clause*

■ The no-recourse clause in Bloom's insurance contract does not bar plaintiffs' recovery of the first 10,000 of the 17,824 British pounds paid by Tyler & Co. to Bloom on the theft of the necklace and lapis lazuli bracelet. New York has approved the analysis of third-party beneficiary contracts set out in the Restatement (Second) of Contracts. *See Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,* 66 N.Y.2d 38, 43–46 & n. 2, 495 N.Y.S.2d 1, 4–6 & n. 2, 485 N.E.2d 208, 210–213 & n. 2, (1985). Section 311 of the Restatement provides that the promisor and promisee by subsequent agreement may discharge a duty owed to a third party in the absence of a term in the promise prohibiting such discharge. § 311(2). Their power to do so only

> terminates when the beneficiary, before he receives notification of the discharge or modification, materially changes his position in justifiable reliance on the promise or brings suit on it or manifests assent to it at the request of the promisor or promisee.

§ 311(3). Even if Skelly is viewed as an intended beneficiary of the no-recourse provision, Tyler & Co.'s duty to her was discharged, at the latest, by December 12, 1985. On that date Bloom sent a letter to Tyler & Co. which stated in part, "[I]f [by reason of the insurance payment Bloom had received] we are not entitled to receive the money [owed by Skelly], Underwriters are entitled to it in our place." Skelly

presented no evidence that she learned of the no-recourse clause before the commencement of this litigation. She does not claim, nor is there any evidence, that she relied on or assented to the clause in any way. Therefore, the dealings between Bloom and its insurance broker have no bearing on the amount that may be recovered from Skelly.

### 3. *Monthly Interest as Liquidated Damages*

■ Bloom's regular invoice, the contents of which Skelly knew, provided that interest on any balance unpaid for more than thirty days would accrue at a rate of two percent a month simple interest, *i.e.,* twenty-four percent per year. It is undisputed that this provision was accepted in earlier transactions between the parties and thus became a part of the course of dealing between them. N.Y.U.C.C. §§ 1–205, 2–208. Therefore Bloom seeks recovery of this interest even though the provision does not appear on the documents actually signed by Skelly. Skelly claims that this interest rate is excessive and therefore unenforceable.

At trial, plaintiffs argued that English law governs this question, and called as a witness an expert on English law, who testified that Bloom's charge of two percent per month for delayed payment for goods would probably be enforced by an English court. But plaintiffs look to New York law to determine all the other issues in this case. Joint Pre–Trial Order at 18. They provide no reason why this single question should be governed by British law when the parties have agreed that the rest of the case should be determined according to the New York Uniform Commercial Code. Nor can I think of any. In any event, under New York law, a late payment charge which is too high to be sustained as a liquidated damages provision, as I find below that this one is, is void as contrary to public policy. *See Equitable Lumber Corp. v. IPA Land Development Corp.,* 38 N.Y.2d 516, 381 N.Y.S.2d 459, 344 N.E.2d 391 (1976); *Truck Rent-a-Center, Inc. v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365, 369, 361 N.E.2d 1015, 1018 (1977). Even if a New York

court were to apply English law to this single issue, it would not enforce a contractual provision which is contrary to the public policy of New York as expressed in a positive statutory enactment that declares that provision void. *Clifton Steel Corp. v. General Electric Co.,* 80 A.D.2d 714, 437 N.Y.S.2d 734 (3d Dept.1981).

■ All parties agree that, since this transaction represents a purchase of goods on credit rather than a loan or forbearance, the New York law against usury does not determine the validity of the agreed interest rate. *See Grumman Flxible Corp. v. City of Long Beach,* 505 F.Supp. 623, 626 (E.D.N.Y.1980); *Zachary v. R.H. Macy & Co.,* 31 N.Y.2d 443, 457 & n. 5, 340 N.Y.S. 2d 908, 918 & n. 5, 293 N.E.2d 80, 88 & n. 5 (1972). *See also* N.Y. Personal Property Law §§ 404(1), 413(3)(a) (parties to retail credit transactions may agree between themselves on amount of finance charge). The parties agree that the appropriate test to determine whether the finance charge in this case is an impermissible penalty is the test applied to liquidated damages provisions. *See In re Felix Contracting Corp.,* 57 B.R. 976, 980 (Bankr.S.D.N.Y.1986) (treating annual finance charge of 18 percent as a liquidated damages provision); *Grumman Flxible* (treating late payment charge of $35 per day as liquidated damages provision).

N.Y.U.C.C. § 2–718(1) governs liquidated damages in sales contracts. It provides:

Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

The New York Court of Appeals has held that under § 2–718(1), a liquidated damages provision will be upheld if it is "reasonable with respect to *either* (1) the harm which the parties anticipate will result from the breach at the time of contracting or (2) the actual damages suffered by the nondefaulting party at the time of the breach." *Equitable Lumber,* 38 N.Y.2d 516, 521, 381 N.Y.S.2d 459, 462–63, 344 N.E.2d 391, 394–96 (1976) (citation omitted) (emphasis in original). The second sentence of § 2–718(1) is held to constitute a separate test, under which a liquidated damages provision may be invalidated "if it is so unreasonably large that it serves as a penalty rather than a good faith attempt to pre-estimate damages." 38 N.Y.2d at 521, 381 N.Y.S.2d at 463, 344 N.E.2d at 395 (citations omitted). *See* Comment, *Liquidated Damages: A Comparison of the Common Law and the Uniform Commercial Code,* 45 Fordham L.Rev. 1349 (1977).

The evidence at trial showed that interest rates in England in the fall of 1985 were thirteen percent. Although the primary purpose of the finance charge was to compensate Bloom for losing the use of the money it was owed, it was also to cover the costs of collection, including attorneys' fees if necessary. But in this case, where amounts in the tens of thousands of dollars were involved, a premium of eleven percent over the then-current interest rate to cover the costs of collection appears to be out of proportion with the probable loss as viewed at the time of contracting. At the time of the sale, Bloom had no basis for believing that its costs of collection on either of these two transactions would go up by hundreds of dollars each month. Indeed, there was no basis for believing that there would be a regular monthly cost of collection of a magnitude anywhere approaching that represented by an eleven percent annual charge. What makes this a close question is that Bloom could have expected its costs of collection from Skelly to be unusually high because of her residence in the United States, thousands of miles away. I have concluded, however, that this finance charge was not reasonable with respect to the harm which the parties anticipated would result from the breach at the time of contracting. Rather than a good-faith attempt to pre-estimate damages, this charge serves as a penalty. Nor has Bloom shown that the actual damages it suffered ap-

proached the sum charged as interest.[1] Therefore, for all the reasons mentioned in *Equitable Lumber*, this finance charge is void as a penalty.[2]

 In a diversity case, prejudgment interest is controlled by the rule of the jurisdiction whose law determines liability. *Entron, Inc. v. Affiliated FM Ins. Co.*, 749 F.2d 127, 131 (2d Cir.1984). Therefore, in any event, Bloom is entitled to prejudgment interest on the recoverable damages, New York CPLR § 5001(a), at a rate of nine percent per year, CPLR § 5004.

CPLR § 5001(b) provides for interest to be computed "from a single reasonable intermediate date" where damages were incurred at various times. *See Woodling v. Garrett Corp.*, 813 F.2d 543, 561 (2d Cir.1987). Since that is the case here, where the exact dates of tender or delivery of the various items are not certain, prejudgment interest at the statutory rate of nine percent shall be computed from October 1, 1985.

## CONCLUSION

On the second claim for relief, Skelly is liable to Bloom for $45,000. She must also bear Bloom's $499.85 cost of transporting the candelabras and centerpiece to London, which represent incidental damages. N.Y.U.C.C. § 2–710.

On the third claim for relief, Skelly owes plaintiffs 41,900 British pounds. New York law requires that this figure be converted into dollars as of the date of the breach. *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 138 (2d Cir.1986). As of October 1, 1985, the exchange rate was $1.4075 to one British pound. Thus, Skelly is liable to plaintiffs for $58,974.25 on the third claim.

---

1. *Felix Contracting* places the "burden of proving" that a finance charge is an impermissible penalty on the party challenging the terms of the contract. 57 B.R. at 980. It is not clear why this language was used. I note that *Felix Contracting* was not decided under the U.C.C.–*Equitable Lumber* test.

2. The parties have not cited *Equitable Lumber* or N.Y.U.C.C. § 2–718(1). Instead, they point to

Prejudgment interest on all these amounts shall be computed from October 1, 1985, at the statutory rate of nine percent.

The foregoing opinion shall constitute my findings of fact and conclusions of law.

Settle judgment by November 30, 1987.

---

the New York common law. *See, e.g., Leasing Service Corp. v. Justice*, 673 F.2d 70, 73 (2d Cir.1982). The result under the common law, which requires, *inter alia*, that the liquidated damages amount not be grossly disproportionate to the probable loss at the time of contracting, would not be different in this case from the result under § 2–718(1).