**Adele GALLIEN, Plaintiff,**

v.

**CONNECTICUT GENERAL LIFE IN-SURANCE COMPANY and Carey Energy Corporation, Defendants.**

**No. 91 Civ. 1734(SWK).**

United States District Court, S.D. New York.

March 12, 1996.

---

Thomas A. Martin, Putney, Twombly, Hall & Hirson, New York City, for plaintiff.

Carl E. Ailara, Jr., McManimon & Scotland, Newark, New Jersey, for defendants.

### ORDER ACCEPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

KRAM, District Judge.

This Court has received and reviewed the Report and Recommendation issued by Magistrate Judge Sharon E. Grubin on February 8, 1996 in the above-captioned action. No timely objections to the Report and Recommendation have been made by the parties to this action. *See* Fed.R.Civ.P. 72(b). The Court has considered the Report and determines that there is no clear error on the face of the record. Because the Court agrees with the recommendation that Connecticut General Life Insurance Company should recover from Carey Energy Corporation a total of $929,613.29, which includes damages of $591,092.00 and prejudgment interest of $338,521.29, it is hereby

ORDERED that the Report and Recommendation issued by Magistrate Judge Grubin on February 8, 1996 is accepted in accordance with 28 U.S.C. § 636(b). It is further

ORDERED that defendant Connecticut General Life Insurance Company is entitled to damages in the amount of $591,092.00 and prejudgment interest in the amount of $338,-521.29, for a total sum of $929,613.29 on its cross-claims against defendant Carey Energy Corporation.

SO ORDERED.

### REPORT AND RECOMMENDATION TO THE HONORABLE SHIRLEY WOHL KRAM

GRUBIN, United States Magistrate Judge:

On April 13, 1994 your Honor granted defendant Connecticut General summary judgment on its cross-claims against defendant Carey Energy and thereafter referred the matter to me for a determination of damages. Damages are based on past due premiums Carey owes Connecticut General under their September 30, 1986 insurance agreement (the "Plan"), as supplemented by a September 30, 1988 letter agreement executed by Carey on October 31, 1988 (the "Supplemental Plan"). I held a hearing on

August 2, 1994, and following their submission of a transcript of that hearing the parties submitted amended memoranda of law pursuant to my directive on July 24, 1995 and August 2, 1995. The following constitute my findings of fact and conclusions of law.

Under the Plan, Connecticut General agreed to provide coverage to Carey's employees for group term life insurance, group accidental death and disability insurance, New York disability insurance and group medical expense insurance. For coverage for group life and accidental death and disability benefits, Carey was obligated to pay monthly "traditional and residual premiums." The medical expense policy was funded through a program that Connecticut General called its Cash Management Program ("CMP"), which featured a "cash flow" option under which Carey was permitted to hold a portion of the premiums until the termination of the Plan. Under the CMP, Carey was obligated to pay a monthly residual premium to cover estimated expenses and to deposit funds upon request, up to a maximum monthly amount, into an account out of which Connecticut General had the authority to write checks for claim payments. Carey was also obligated to pay a deferred supplemental premium, the amount of which was to be calculated according to paragraph 16(b) of a CMP "Rider Form GM 2554" attached to the parties' original agreement. Paragraph 16 provided that the following sums were to become "immediately due" upon termination of that rider:

a. All unpaid monthly premiums; and

b. The excess, if any, of:

    (1) The sum of the Maximum Monthly Payments for each of the Policy Months in the last Policy Year, over

    (2) The sum of:

        (i) all Plan Benefits the Employer has paid with respect to such Policy Year; and

        (ii) all Plan Benefits unpaid at the time of such termination, which the Employer is (at the time of such termination) obligated to pay with respect to such Policy Year.

Pursuant to the Supplemental Plan executed two years after the original agreement, a supplemental premium was nominally due each month but was "waived contemporaneously with a subsequent Supplemental Premium becoming due," and the supplemental premium outstanding at the termination of the Agreement was payable on the date of termination. The Supplemental Plan set forth the following new formula for calculating the "Supplemental Premium":

    (a) An amount equal to the estimated liability for incurred but unreported claims at the close of the preceding policy year (being $264,454 as of October 1, 1988); PLUS

    (b) the unpaid portion, if any, of the Maximum Monthly Payments from October 1, 1988 to the date as of which item (a) is revised.

The Supplemental Plan further provided that "[b]y use of this formula, the amount described in paragraph 16(b) of the CMP Rider Form GM2554 is incorporated into this amount."

It is not disputed that in July 1989 Carey stopped paying premiums due under the Plan and that Connecticut General terminated the Plan for nonpayment of premiums effective October 19, 1989. The parties have stipulated that the amount owed for unpaid monthly residual premiums is $75,515. However, they dispute the amounts owed for bank account underfunding and the supplemental premium.

According to Connecticut General, Carey owes it $822,546, which consists of: (1) the $75,515 in residual premiums; (2) bank account underfunding of $94,211; and (3) an unpaid supplemental premium of $652,820, which is the sum of $264,454 (the amount due as of October 1, 1988) and $388,366 (the unpaid portion of Carey's Monthly Maximum Payments from October 1, 1988 to October 19, 1989). According to Carey, it owes Connecticut General only $256,657, which consists of: (1) the $75,515 in residual premiums; (2) bank account underfunding of $74,927; and (3) an unpaid supplemental premium of $106,215.

■ With respect to the bank account underfunding, Connecticut General introduced records that showed, according to the testimony of Robert A. Marino, the underwriter at CIGNA Corporation responsible for the Carey account at the time of its termination, that at Citibank's request Connecticut General transferred $94,211 to Carey's Citibank account to cover claims payments while the contract was in effect. Tr. 25–27; CG Ex. C. John O'Mahoney, Carey's Insurance Manager, testified that $19,285 of the $94,211 was used to pay "run-off" claims that were incurred prior to but not reported until after termination of the Agreement. Following the hearing, Carey submitted a declaration from its former treasurer Alan Berdy stating that he "believe[s]" that Connecticut General incorrectly included "run-off" claims of $19,285 in its figure for bank account liability. Neither Mr. O'Mahoney nor Mr. Berdy cited any evidence in support of this belief, however. *See* Tr. 66–68. On the basis of Mr. Marino's testimony and the documentary record, I therefore find that Carey owes Connecticut General $94,211 in bank account underfunding.

With respect to the supplemental premium, Carey does not dispute that, as set forth in the Supplemental Plan, as of October 1, 1988 the "estimated liability for incurred but unreported claims at the close of the preceding policy year" was $264,454. *See* Tr. 66. Nor does Carey dispute Connecticut General's figures that during the period October 1, 1988 through October 19, 1989 the unpaid portion of Carey's maximum monthly amounts was $338,366. Connecticut General insists that the "clear and unambiguous" meaning of the Supplemental Plan is therefore that the supplemental premium is simply the sum of $264,454 "PLUS" $388,366.

■ In Connecticut General's view, the supplemental premium is to be understood as the accumulation, over the years of the agreement, of the "margins" by which Carey's maximum monthly payments exceeded its actual payments. Mr. Marino testified that the agreement was structured so that Connecticut General's profit was largely a function of the amount of the supplemental premium (its "margins") minus any amounts

it was required to pay for benefits above Carey's maximum monthly payment ceiling (its "deficits"). Although this understanding is apparently reflected in item (b) of the Supplemental Plan premium formula, which on its face is the sum of margins from October 1, 1988 to the date of termination, it does not follow that item (a) was to remain fixed at $264,454. A more logical interpretation of the Supplemental Plan—one that is not inconsistent with the generation of profits for Connecticut General from the supplemental premium—is that item (a) was to be revised and updated on the basis of further information about the amount of "incurred but not reported claims" on the date as of which the supplemental premium was calculated.

Under the original agreement, as ¶ 16(b) of the CMP Rider makes clear, the original version of the supplemental premium calculation was based on the sum of margins, but it was limited to margins during a single policy year, *i.e.*, "the last Policy Year," not *all* preceding years ("The sum of the Maximum Monthly Payments *for each of the Policy Months in the last Policy Year*"; "all Plan Benefits the Employer has paid *with respect to such Policy Year*"; "all Plan Benefits unpaid at the time of such termination, which the Employer is ... obligated to pay *with respect to such Policy Year*"; emphasis added). Although item (b) in the Supplemental Plan is based on the net accumulation of unpaid margins over the years beginning with October 1, 1988, the language of the new formula suggests that item (a) is not fixed but is instead to be revised, if not superseded, on the basis of newer information, just as under ¶ 16(b) of the CMP Rider the amount of the supplemental premium was eventually superseded by the subsequent policy year's margins and "run-off" claims.

■ The definition of item (a) in the new formula is "estimated liability for incurred but unreported claims at the close of the preceding policy year." No explanation is given for how it is to be calculated, but for the parenthetical information that it is $264,454 as of October 1, 1988. As Carey plausibly argues, the definition corresponds to what the parties call "run-off" claims. The word "estimated" and the phrases "incurred

but unreported" and "to the date as of which item (a) is revised" all suggest that item (a) is an amount that is to be revised, presumably on the basis of subsequently obtained information regarding the amount of claims that were incurred "but unreported" as of October 1, 1988 but were subsequently reported as well as claims incurred after October 1, 1988 but not reported prior to the date the agreement was terminated. Claims that were "incurred but unreported" as of October 1, 1988 but reported prior to the termination of the agreement will be reflected in item (b) of the newer formula since they will be included in the "paid" portion of subsequent months' Maximum Monthly Payments. In sum, the plausible interpretation of the language (which is hardly, as Connecticut General insists, "clear and unambiguous") must be that item (a) refers to the amount of "run-off" claims remaining as of the date of termination of the agreement, October 19, 1988, "the date as of which item (a) is revised." On the basis of Mr. Marino's testimony, I find that as of October 19, 1989 there were remaining "run-off" claims of $33,000, and that item (a) is therefore $33,000.[1]

■ The language of the Supplemental Plan *is* clear and unambiguous with respect to item (b), however. As Connecticut General maintains, item (b) is defined straightforwardly as "the unpaid portion ... of the Maximum Monthly Payments from October 1, 1988 to [October 19, 1989]," and Connecticut General has made an undisputed showing that this amount is $388,366. In a convoluted shaggy-dog argument that would require totally dispensing with the language of item (b) and rests on a section of the Supplemental Plan dealing with a wholly unrelated subject (the "Experience Rating Process" and Connecticut General's administration of the Plan), Carey argues first that the Supplemental Plan also provides for the recovery of deficits from margins; that deficits during the first two years of the agreement were $260,789; that Connecticut General, as an

incentive to Carey, agreed to amortize recovery of this sum over the third, fourth and fifth years of the policy; and that Connecticut General is therefore entitled to recover only $86,930, *i.e.*, one-third of $260,789, as item (b). Apart from the unsubstantiated testimony of Mr. O'Mahoney and declaration of Mr. Berdy, Carey has put forward no evidence supporting this alleged superseding agreement, and under the parol evidence rule their extrinsic testimony, offered to contradict the clear and unambiguous terms of a written agreement, is inadmissible. *Investors Ins. Co. v. Dorinco Reins. Co.*, 917 F.2d 100, 104 (2d Cir.1990); *NYSA–ILA Medical & Clinical Services Fund v. Golten Marine Co.*, No. 91 Civ. 4707 (SWK), 1994 U.S.Dist. Lexis 20280 at *3, 1994 WL 800706 at *1 (S.D.N.Y.1994); *Royal Bank of Canada v. Mahrle*, 818 F.Supp. 60, 62 (S.D.N.Y.1993); *Stroll v. Epstein*, 818 F.Supp. 640, 645 (S.D.N.Y.), *aff'd*, 9 F.3d 1537 (2d Cir.1993); *Adler & Shaykin v. Wachner*, 721 F.Supp. 472, 476 (S.D.N.Y.1988). Even apart from this fatal difficulty, Carey's account of this alternative understanding lacks credibility because it is difficult to believe that these two sophisticated companies would not have any agreement, letters, memos or documentation of any kind reflecting anything about an oral understanding of this type.

Connecticut General is thus entitled to recover $388,366 as item (b), and a total supplemental premium of $421,366, *i.e.*, $33,000 plus $388,366. I therefore recommend that Connecticut General recover a total of $591,092 in damages, *i.e.*, (1) residual premiums of $75,515; (2) bank account underfunding of $94,211; and (3) a supplemental premium of $421,366.

In addition, plaintiff is entitled to recover prejudgment interest calculated at a simple rate of 9% per annum as of the date all amounts became due, October 19, 1989. N.Y.Civ.Prac.L. & R. §§ 5001(a), 5004 (McKinney 1992); *see Nu–Life Constr. Corp. v. Board of Educ.*, 789 F.Supp. 103, 106

---

1. As set forth below, despite the downward revision of item (a), the supplemental premium remains substantial by virtue of the accumulation of margins in item (b). The construction of item (a) set forth here, moreover, is consistent with Connecticut General's ability to realize profits from this agreement and with the function of the supplemental premium as a reserve fund for "incurred, but unreported liability," which Connecticut General emphasized in its communications with Carey following execution of the original agreement. *See* Carey Ex. B.

**144**

(E.D.N.Y.1992); *Novelty Textile Mills, Inc. v. C.T. Eastern, Inc.,* 743 F.Supp. 212, 221 (S.D.N.Y.1990); *SEC v. Musella,* 748 F.Supp. 1028, 1043 (S.D.N.Y.1989), *aff'd,* 898 F.2d 138 (2d Cir.), *cert. denied,* 498 U.S. 816, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990); *N. Bloom & Son v. Skelly,* 673 F.Supp. 1260, 1269 (S.D.N.Y. 1987); *Kaufman v. Le Curt Constr. Corp.,* 196 A.D.2d 577, 601 N.Y.S.2d 186, 188–89 (2d Dep't 1993); *Long Playing Sessions, Inc. v. Deluxe Labs., Inc.,* 129 A.D.2d 539, 540, 514 N.Y.S.2d 737, 738 (1st Dep't 1987). I therefore recommend that Connecticut General recover $338,521.29 in prejudgment interest.[2]

### CONCLUSION

For the reasons set forth above, I recommend that Connecticut General recover from Carey Energy a total of $929,613.29, which includes damages of $591,092.00 and prejudgment interest of $338,521.29.

Copies of this Report and Recommendation were mailed February 8, 1996 to:

Thomas A. Martin, Esq.
Putney, Twombly, Hall & Hirson
521 Fifth Avenue, 10th Floor
New York, New York 10175

Carl E. Ailara, Jr.
McManimon & Scotland
One Gateway Center
Newark, New Jersey 07102–5311

The parties are hereby directed that if you have any objections to this Report and Recommendation you must, within ten (10) days from today, make them in writing, file them with the Clerk of Court and send copies to the Honorable Shirley Wohl Kram, to the opposing party and to the undersigned. Failure to file objections within ten (10) days will preclude later appellate review of any order that will be entered by Judge Kram. *See* 28 U.S.C. § 636(b)(1); Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure; *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696

**2.** To allow for the filing of objections before judgment may be entered pursuant to this Report and Recommendation, interest has been calculated to February 28, 1996. *See Torres v. CBS*

(1992); *Small v. Secretary,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983) (per curiam).

Dated: New York, New York
February 8, 1996

*News,* 879 F.Supp. 309, 311–12 (S.D.N.Y.1995). For each day thereafter until judgment is entered, $145.3505 per day should accrue.