724 F.Supp. 1132 (1989)
AMALGAMET INC., Plaintiff,
v.
UNDERWRITERS AT LLOYD'S UNDER POLICY NUMBERS K3PS91031/V01, et al., Defendants.
No. 88 Civ. 0611 (JMW).
United States District Court, S.D. New York.
November 13, 1989.
*1133 George Graff, James Kleiner and Lucy Prashker, Milgrim, Thomajan & Lee, P.C., New York City, for plaintiff.
*1134 William Warner, Symmers, Fish & Warner, New York City, for defendants.

MEMORANDUM AND ORDER
WALKER, District Judge:
Defendant Underwriters seeks summary judgment pursuant to Fed.R.Civ.P. 56 dismissing plaintiff Amalgamet Inc.'s breach of insurance contract claim. Plaintiff seeks partial summary judgment dismissing defendants' affirmative defenses and declaring coverage under the insurance policy. For the reasons stated below, the Court grants plaintiff's motion in part and denies defendant's motion in its entirety.

I. BACKGROUND
Except where noted, the following facts are not in dispute:

A. The Parties' Insurance Agreements and the Loading of Cargo

Plaintiff Amalgamet Inc. ("Amalgamet") is a diversified company which trades in certain metals. In 1986, Amalgamet chartered the Kapetan Antonis  a ship owned by Julianae Shipping Corporation ("Julianae")  to carry a cargo of ferrous metal turnings from Providence, Rhode Island and New Haven, Connecticut to Amalgamet's purchaser in Spain. "Ferrous metal turnings" are steel shavings generated from the machining processes of manufacturing plants. Because turnings are susceptible to spontaneous combustion, they are classified as "hazardous" under Coast Guard regulations governing their handling and shipping. It is not disputed that there is no objective method of determining the safety of any particular cargo load of turnings.
Amalgamet secured cargo insurance from defendant Underwriters to cover loss to the cargo.[1] The cargo policy was a so-called "all risks" policy, which covered risks caused even by the negligence of Amalgamet's own employees. It was a permanent cargo open cover policy, which automatically covered all cargoes shipped during the policy's effective period. Moreton Aff. ¶ 6.[2] As required by the policy, Amalgamet "declared" the Kapetan Antonis cargo to its underwriters after the ship was loaded on February 7, 1986. Amalgamet issued a Certificate of Insurance relating to those goods and paid the applicable premium. D. Ex. 4; Moreton Aff. ¶ 6. The premium was "15% of the value of the cargo," but 30% for turnings/borings. P.Ex. B.
With respect to turnings, the policy provided that coverage would include loss or damage "by fire or heating even when caused by inherent vice or spontaneous combustion." P.Ex. B. In addition, the policy set forth certain warranties from the insured which "always apply to shipments of turnings and/or borings":
A) Turnings and/or borings to be surveyed before arrival of vessel and during loading by a specialist of the Assured's organization who shall confirm in a written statement that the turnings and/or borings:
I) Have to his satisfaction not been stockpiled for more than six months at Assured's premises, when supplied from there
II) Are of good condition and suitable quality and fitness for the intended sea voyage
Copy of statement to be made available to the Master, and a copy sent to Underwriters.
B) Joseph Erwin and Co. or Captain Covy or National Cargo Bureau or Fisher Marine Surveys, Michigan or Peter B. Kelman, Inc. East Brunswick (emphasis added) or Champness & Assn., Inc. Michigan or expert approved by Underwriters is to approve and confirm the loading of turnings and/or borings in accordance with United States Coast Guard regulations.
* * * * * *

*1135 E) If turnings and/or borings are loaded at more than one port, then the same specialist and expert at initial port to attend at all subsequent ports, and to act in accordance with requirements to 4(a) and (B) above.
P.Ex. B.
Pursuant to warranty "A" of the cargo policy, Amalgamet employed as its expert Robert J. Weil ("Weil"), a vice-president of the company, to inspect the turnings and to certify that (i) they had not been stockpiled for more than six months and (ii) they were of good condition and were suitable quality for sea voyage.
Amalgament also retained Peter B. Kelman, Inc., pursuant to warranty "B" which expressly named that corporation as an expert, to approve and confirm that the loading of the turnings complied with applicable Coast Guard regulations. P. 3(g) Statement at 2. Peter B. Kelman, Inc. appointed its surveyor, Steven L. Shinn. ("Shinn"), to act on its behalf.
In late January and early February, 1986, Amalgamet loaded turnings on board the Kapetan Antonis from Providence, Rhode Island and New Haven, Connecticut, respectively. The parties dispute whether these loadings were actually conducted in accordance with their agreements. The Providence turnings came from Amalgament's own inventory. Moreton Aff. ¶ 4. Weil selected and inspected the turnings loaded aboard the vessel and Shinn surveyed the ship and took drafts before and after the loading. Shinn approved the cargo and confirmed that the Providence turnings had been loaded in accordance with Coast Guard regulations.
Unable to fill the purchaser's order from its Providence inventory, Amalgamet obtained the balance of the turnings cargo from Michael Schiavone & Sons ("Schiavone"), a New Haven, Connecticut turnings supplier. Before loading, these turnings were inspected several times. The parties, however, dispute the extent and sufficiency of these inspections. During the month prior to shipment, Juan Echeverria, the chief buyer for Amalgamet's Spanish buyer, visited the Schiavone yard to inspect the turnings. Prior to loading the turnings in New Haven, Shinn boarded the vessel to conduct his draft survey. According to Shinn, he inspected the material waiting on the quay to be loaded and found it to be acceptable. He also looked into holds 3 and 4 containing the Providence cargo to check its condition.[3] Also, on each day throughout the New Haven loading of the vessel, Randolph Weil was present. The actual extent of his inspections and whether he acted in good faith, however, is disputed.
On February 6, 1986, Weil and Echeverria concluded that they had exhausted the supply of acceptable turnings and stopped the loading. The parties then agreed to substitute a cargo of bushelings to make up for the lost tonnage.
Following the New Haven loading, while the vessel was at anchor waiting for the turnings to cool, a fire spontaneously ignited in holds 3 and 4 containing turnings from both Providence and New Haven. The damages to the ship, terminal and cargo caused by the fire spawned this and other legal proceedings.

B. Actions Undertaken Pursuant to Cargo Policy Warranties

On March 3, 1986, Amalgamet met with Underwriters' counsel. Underwriters allegedly stated that Amalgamet would be deemed to be fully covered if written confirmations were supplied pursuant to the cargo policy. Accordingly, Weil issued confirmations pursuant to warranty "A" of the policy stating that the turnings loaded on board the Kapetan Antonis were of suitable quality and had not been stockpiled at Amalgamet's premises for more than six months. On or about March 5, 1986, Amalgamet signed the confirmations, which were dated January 29 and February 14 to correspond to the days the cargo had actually been loaded in Providence and New Haven. These confirmations were then submitted to defendants.
*1136 The Providence warranty statement read:
 January 29, 1986
WARRANTY FOR TURNINGS AND/OR BORINGS LOADED ABOARD THE "M/V KAPETAN ANTONIS" (HOLDS 3 AND 4) AT PROVIDENCE, R.I. JANUARY 24/25, 1986
TO WHOM IT MAY CONCERN:
Turnings and/or borings have been surveyed before arrival of the above named vessel and during loading of said vessel by Mr. Randolph J. Weil, Vice President of Amalgamet, Inc., who hereby confirms:
A) Turnings and/or borings have not been stockpiled for more than six months at Amalgamet, Inc. storage facility in Providence, Rhode Island.
B) That these turnings and/or borings are of good condition and suitable quality and fitness for the intended sea voyage.
 /s/ Randolph J. Weil
 Randolph J. Weil
 Vice-President, Amalgamet Inc.
The New Haven warranty was identical except for the date, loading site, and the fact that the cargo was loaded into holds 1, 3, 4 and 6.
On about March 5, 1986, Peter B. Kelman, Inc. signed an undated "Commodity Condition Survey/Warranty" pursuant to warranty "B" of the cargo policy which Amalgamet submitted to the defendants. This warranty reads:
Providence  January 23, 1986 to January 28, 1986
New Haven  February 3, 1986
This is certify /sic/ that the turnings cargo was inspected at both Providence, R.I. and New Haven, Conn., prior to loading on the above vessel and was found to be suitable for loading.
Temperatures were monitored at Providence during the loading. On the completion of trimming the high reading of 198oF was recorded. The U.S. Coast Guard was informed and vessel waited for 2 days until coast Guard gave permission to sail to New Haven, as temperatures had fallen below 190oF, and the Captain of the Port granted a short duration voyager waiver.1 At New Haven, the No. 3 and No. 4 hold temperature had fallen, the high reading monitored was 112oF @ # 3, 134oF @ # 4 holds. Coast Guard gave permission to load. On completion of loading at New Haven, temperatures were found to be higher than 150oF and Coast Guard denied permission to sail but allowed vessel to go to the anchorage in order for temperatures to be monitored during the cooling period.
The turnings were loaded in accordance with U.S. Coast Guard Regulations CFR148.04-3, cargo excluded case iron turnings or borings, no motor blocks or transmissions were loaded on top of turnings and according to the Charter Party vessel was not intended for break up.
This report is issued without prejudice.
 /s/ P.B. Kelman
 Peter B. Kelman, Inc.
In a letter dated March 7, 1986, to its clients, Underwriters' counsel wrote that "In our opinion the Assured [Amalgamet] has complied with the requisite warranties of the insurance applicable to shipments of turnings and/or borings." P.Ex. S. The letter recommended that Underwriters "approve giving the vessel the customary General Average Guarantee." However, Underwriters ultimately decided to await the decision of the arbitration panel in the arbitration between the vessel's owner, Julianae, and Amalgamet prior to paying Amalgamet's claim. P.Ex. U.

C. Previous Court and Arbitration Proceedings

1. Connecticut District Court Proceeding
On February 22, 1986, Julianae, the ship owner, commenced suit in Connecticut District Court against Amalgamet, New Haven Terminal, and Schiavone for damages caused by the fire and for Amalgamet's alleged breach of the Charter Party. Amalgamet, through its counsel Milgrim, Thomajan & Lee, filed counter and cross claims for damages to the cargo against Julianae and Schiavone. Kleiner Aff. ¶ 12. Eventually, *1137 the cargo discharged at New Haven Terminal was sold at a judicial sale and the proceeds were deposited with the Connecticut District Court where they are being held to satisfy the shipowner's claims.

2. The SMA Arbitration
On February 24, 1986  two days after filing the Connecticut action  Julianae brought an action in this Court to obtain an order compelling arbitration pursuant to the Charter Party. The Court granted Julianae's request and, between March 10, 1986 and January 9, 1988, hearings were held before a panel of three arbitrators from the Society of Maritime Arbitrators ("SMA") in New York City. The panel heard eighteen witnesses over seventeen days including the ship's master, Julianae's director, surveyors, Amalgamet personnel, Schiavone personnel, terminal personnel, and consultants in the fields of engineering, chemistry, metallurgy, and turnings. Warner Aff. ¶ 3. The panel found that Weil was negligent in selecting and inspecting the turnings to be loaded in New Haven, that Amalgamet was negligent in loading unsafe turnings in New Haven and that the fire was directly caused by the inherent quality of the cargo. The panel concluded that Amalgamet bore the responsibility for the damages Julianae sustained. Warner Aff. ¶¶ 8-10. The panel did not find, however, that Weil acted fraudulently, recklessly or in wanton disregard of the safety of the vessel owner or its crew. Moreover, the panel did not make several possible factual findings regarding the extent of Amalgamet's negligence, such as when Amalgamet was first advised of fire on board the vessel.

3. The AAA Arbitration
While the SMA arbitration was proceeding, Schiavone, asserting that ownership of the New Haven turnings had passed to Amalgamet upon delivery of the vessel, commenced an arbitration against Amalgamet before the American Arbitration Association ("AAA") for payment under its sales contract. Amalgamet contested its ownership of the cargo, but reserved its rights to the goods in case the panel rejected its arguments that title had not passed.
During the arbitration, plaintiff discussed the possibility of a global settlement of all disputes among the parties in the Connecticut and New York proceedings. On September 22, 1987, Amalgamet advised Underwriters' counsel of a proposed settlement and offered to reduce Amalgamet's insurance claim if Underwriters would immediately confirm coverage. Kleiner Aff. ¶ 23. Defendants' counsel agreed to dispatch Amalgamet's proposal to their clients without a recommendation. Kleiner Aff., Ex. 16.
By letter dated November 18, 1987, Amalgamet's counsel advised Underwriters' counsel that Schiavone had agreed in principle to settle its claim against Amalgamet for a substantial discount, conditioned upon the parties agreement to a global settlement. Kleiner Aff., Ex. 18. Underwriters' counsel did not respond to either this letter or to a subsequent letter dated December 31, 1987, which advised counsel that no global settlement had yet been reached. Kleiner Aff., Ex. 19.
On January 26, 1988, Amalgamet wrote Underwriters' counsel that it intended to settle with Schiavone for Amalgamet's payment of $715,000 and release of all claims for loss of cargo. Amalgamet invited Underwriters' comments. Again, Underwriters' counsel did not respond. On July 12, 1988, Schiavone and Amalgamet executed an agreement with mutual releases that settled all pending claims in the AAA proceeding. It provided that Amalgamet was to pay Schiavone $715,000 for the New Haven cargo, representing a "savings" to Amalgamet of over $350,000. Kleiner Aff. ¶ 27.

D. The Present Action

In November, 1986, Amalgamet submitted to Underwriters a claim of approximately $466,000, later amended to $418,230, for the cargo loaded in Providence. Moreton Aff., Ex. 6. Underwriters neither rejected nor paid this claim. Nine months later, on August 27, 1987, Amalgamet submitted to Underwriters its full claim in the *1138 amount of approximately $1,613,000 for both cargos, and a claim for approximately $134,908 in legal fees incurred to that date. Moreton Aff., Ex. 7. Again, Underwriters did not respond.[4]
On January 29, 1988, Amalgamet commenced the instant action against Underwriters. The complaint alleges that the insurance policy was in effect at the time of the loss, that the loss resulted from events that were expressly insured under the policy, that Amalgamet duly filed a claim under the policy and that Underwriters had wrongfully refused to pay that claim.
Underwriters denied liability and raised the following principal affirmative defenses: (1) that plaintiff misrepresented and failed to disclose material circumstances that would have influenced the judgment of Underwriters in fixing premiums and determining whether to take the risks; (2) that plaintiff failed to comply with the express and implied warranties of the insurance contract; (3) that plaintiff failed to take reasonable measures to ensure that all rights against third parties were properly preserved and exercised; and (4) that plaintiff failed to take reasonable measures for the purpose of avoiding or minimizing its losses. Defendant also asserted that plaintiff failed to state any claim upon which relief could be granted; that plaintiff did not have an insurable interest; that all insurers under the jurisdiction of this Court are liable jointly; and that a proper valuation of the goods was not given in the insurance contract.
Underwriters now moves for summary judgment dismissing the complaint on grounds that there is no genuine issue of material fact with respect to (1) plaintiff's breach of the express warranties of the open cargo policy; (2) plaintiff's non-disclosure of material circumstances that were known to plaintiff when it issued the certificate and submitted "warranty" writings. Underwriters also contends that, assuming coverage, plaintiff breached the requirements under the policy's "Duty of Assured Clause" to (a) take such measures as may be reasonable for the purpose of averting or minimizing the loss and (b) to ensure that all rights against third parties were properly preserved and exercised.
For its part, Amalgamet moves for partial summary judgment dismissing defendants' affirmative defenses and declaring coverage under the open cover cargo policy. Plaintiff contends that no material issue of fact remains to be tried relating to coverage and that the only issues left to be tried relate to the amount of the loss covered under the policy.

II. DISCUSSION

A. Collateral Estoppel Theories

Amalgamet argues that the doctrine of collateral estoppel precludes defendant from disputing the SMA arbitration panel's finding that Amalgamet was no more than ordinarily negligent and was not guilty of fraud or recklessness. Because the cargo policy in question was a so-called "all risks" policy which covered risks caused by the negligence of Amalgamet's employees, Amalgamet urges the Court to declare coverage under the policy. At the outset, then, the Court must determine whether the doctrine of collateral estoppel applies to the present case.
In sum, the doctrine of collateral estoppel, or issue preclusion, precludes a party from relitigating an issue that "was raised, litigated, and actually decided by a judgment in a prior proceeding, regardless of whether the two suits are based on the same cause of action." Balderman v. U.S. *1139 Veterans Administration, 870 F.2d 57, 62 (2d Cir.1989). In Gelb v. Royal Globe Insurance Co., 798 F.2d 38, 44 (2d Cir.1986), cert denied, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987), the Second Circuit succinctly summarized the four conditions that must be satisfied to invoke collateral estoppel:
(1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.
Applying Gelb, the Court finds that the doctrine of collateral estoppel does not apply to the instant case because the issue decided in the SMA arbitration concerned only Amalgamet's negligence with respect to its duties to Julianae pursuant to the Charter Party. In contrast, the issues in the present case focus upon Amalgamet's duties under the policy of cargo insurance. These issues were not a part of the SMA arbitration proceeding and were not actually litigated or determined by the arbitrators' award.[5] Also, while Amalgamet's culpability was litigated in the SMA arbitration in reference to the Charter Party, the arbitrators did not make findings as to many key factual issues bearing on culpability, including findings as to when Amalgamet was first advised of the fire.
Under these circumstances, the doctrine of collateral estoppel does not bar Underwriters from litigating the extent of Amalgamet's negligence under the insurance policy. It follows that the Court cannot at this time declare coverage under the cargo policy. With this finding in hand, the Court now turns to the parties' motions for summary judgment pertaining to defendants' affirmative defenses.

B. Summary Judgment

Summary judgment must be denied unless the court determines that there is no genuine issue of material fact to be tried. Fed.R.Civ.P. 56(c). In assessing the record to determine whether there is a genuine issue as to any material fact, "the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought." Balderman, M.D. v. United States Veterans Admin., 870 F.2d 57, 60 (2d Cir.1989). The Second Circuit has repeatedly noted that "`summary judgment is generally inappropriate where intent and state of mind are implicated.'" Ramseur v. Chase Manhattan Bank, 865 F.2d 460 (2d Cir.1989) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985)). Guided by these principles, the Court examines each of defendants' disputed affirmative defenses in turn.

1. Breach of Warranties
Underwriters' contends that the Court can find on the basis of the present record that plaintiff breached express warranties in the insurance policy. Specifically, Underwriters asserts that the turnings were neither sufficiently surveyed nor properly attended to prior to or during loading and that the cargo was not in good condition or fit for shipping. Accordingly, Underwriters argues that Amalgamet did not perform specific conditions precedent to the insurer's obligation under the open cover cargo policy. These contentions raise triable issues of fact.
The insurance policy in question requires that a specialist with the assured's organization survey the turnings, confirm that they have not been stockpiled for more than six months and that the cargo is in good condition. The parties dispute whether Weil was at the scene during the relevant times to properly survey the turnings and disagree as to the manner in which Weil conducted his survey. Because these factual disputes are highly material, the *1140 Court cannot grant summary judgment on defendants' breach of warranties claim.
Moreover, the parties dispute whether the Weil survey met the required "good faith" standard of the policy. The Second Circuit has "held several times that `summary judgment' is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." Leberman v. John Blair & Co., 880 F.2d 1555, 1560 quoting Pfizer, Inc. v. Int'l Rectifier Corp., 538 F.2d 180, 185 (8th Cir. 1976), cert. denied, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977). In this case, assuming a survey, the alleged existence of good faith presents an additional triable issue which renders summary judgment inappropriate.[6]

2. Non-disclosure
The Court also denies Underwriters' motion for summary judgment on its claim that Amalgamet failed disclose all material circumstances known to it. Specifically, Underwriters claims that "plaintiff knew and did not disclose to defendants when it issued the certificate of insurance that: (a) the turnings were not `surveyed before the arrival of the vessel and during loading by a specialist of the Assured's organization'; (b) the turnings were not `of good condition and suitable quality and fitness for the intended sea voyage'; and (c) the `expert' did not `attend' the loading of the turnings." D. Mem. at 8. Upon review of parties' detailed submissions, the Court finds that all of these claims present triable issues of fact.
At this juncture, the Court cannot draw the inference that Weil's negligent inspection of the turnings establishes that Amalgamet withheld material information affecting the risk of policy. It is well settled that "[a] judge may not on a motion for summary judgment draw fact inferences" for the movant. Cross v. United States, 336 F.2d 431, 433 (2d Cir.1964). Thus, summary judgment on the issue of nondisclosure is inappropriate.

3. Compliance With "Duty of Assured" Clause
Underwriters further contends that, assuming coverage, Amalgamet breached the requirements under the cargo policy's "Duty of Assured Clause" to (a) take such measures as may be reasonable for the purpose of averting or minimizing the loss and (b) to ensure that all rights against third parties were properly preserved and exercised. Where a duty to mitigate exists, the burden of proof that a party breached that duty falls on the party asserting the breach. See e.g., Federal Insurance Co. v. Sabine Towing & Transportation Co., 783 F.2d 347, 350 (2d Cir. 1986); Great Northern Insurance Co. v. Dayco Corp., 637 F.Supp. 765, 777 (S.D.N. Y.1986). Placing the burden on Underwriters to prove breach of duty, then, the Court examines each of Underwriters' claims concerning the "Duty of Assured Clause" in turn.

a. Duty to Minimize Loss

In support of its first contention that plaintiff failed to take reasonable measures to minimize the continuing deterioration of the goods, Underwriters notes several findings of the SMA award regarding Amalgamet's failure to actively participate in the fire fighting and salvage operations. Underwriters further contends that Amalgamet ignored repeated requests by the master of the Kapetan Antonis to bring the ship back to the loading pier as a means of remedying the turnings' heating problems. Underwriters concludes that the present record supports a finding that Amalgamet's response to the fire was unreasonable. The Court disagrees.
On the present record, the Court cannot make a finding of unreasonableness as a matter of law. Indeed, Amalgamet's efforts to ensure that the authorities were *1141 fighting the fire could reasonably be construed as compliance with the duties prescribed by the cargo policy. See Kleiner Aff. ¶¶ 7-9. Additionally, Amalgamet contends that it was not made aware of the master's warnings to berth the ship. Plaintiff's knowledge and the sufficiency of plaintiff's efforts to comply with the "Duty of Assured" clause present material factual issues making summary judgment inappropriate.[7]

b. Duty to Preserve Rights Against Third Parties

Underwriters also contends that Amalgamet's settlement with Schiavone breached its duty to ensure that all rights against other third parties were properly preserved. This contention is without merit. Defendant, in its answer dated February 18, 1988, clearly denied any liability to plaintiff. Plaintiff then released Schiavone in July, 1988, nearly four months after defendants denied coverage. Under these circumstances, plaintiff's settlement did not prejudice defendants' rights.
"It is well settled that, at least after a denial of liability by an insurer, the insured may enter into a settlement with a third party without prejudicing its rights against the insurer." Bunge Corporation v. London and Overseas Insurance Co., 394 F.2d 496, 497 (2d Cir.1968). See also Meredith v. The Ionian Trader, 279 F.2d 471, 474 (2d Cir.1960) ("An insurer acquires no interest in a claim of the insured against a third party until it makes payment under the contract of insurance or suffers a judgment against it in the amount of the claim.") The court in Bunge explained the reasoning behind this well-established rule:
To require that the insured first fully litigate its dispute with the insurer before pursuing the third party would be manifestly unfair. The possibility of prompt reimbursement would be lost. Moreover, because of the financial condition of the third party or the size of other claims pending against it, it might be essential that redress against the third party be promptly pursued lest nothing remain to satisfy the insured's claim. On the other hand, the self-interest of the insured affords considerable protection to the insurer under the present rule. Recognizing the possibility that his suit against the insurance company may fail, the insured will attempt to recoup as much of his losses as possible from the third party. If the insured is ultimately held liable, the amount so recovered will inure to its benefit.
394 F.2d at 497. Once an insurer denies coverage, the insured may settle with third parties without prejudicing its rights against the insurer, so long as the settlement is made "in good faith." Bunge Corp. 394 F.2d at 497. Accord Luria Bros. & Co. v. Alliance Assur. Co., Ltd., 780 F.2d 1082 (2d Cir.1986) ("When an insurer declines coverage, as here, an insured may settle rather than proceed to trial to determine its legal liability").[8]
Underwriters has not persuaded the Court that it should deviate from these well-settled principles here. Underwriters has not cited, and the Court has not found, any cases in which application of this rule is changed by the existence of an express provision requiring preservation of rights against third parties. Here it would be unreasonable in the face of plaintiff's good faith settlements  made four months after defendant had denied coverage  to hold that the "preservation of rights" provision precluded such settlements. Defendants also attempt to distinguish Bunge Corp. and Luria Bros. on the ground that the *1142 insurance involved in those cases was "liability" as opposed to "cargo" insurance. This distinction is unpersuasive.
Moreover, the authority upon which defendants rely, Ingersoll Milling Machine Co. v. M/V Bodena, 829 F.2d 293 (2d Cir. 1987), cert. denied, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988), does not change the general rule articulated in Bunge Corp. Ingersoll simply stands for the proposition that an insurer retains its right of subrogation even after it litigates coverage to the extent such rights exist. The Second Circuit in Ingersoll simply states:
It is well settled that an insurer has an equitable right of subrogation as a matter of law upon making payment to its insured for a cargo loss.... An insurance company retains its right of subrogation even after it litigates coverage and suffers a judgment requiring payment to the insured.
Id. at 309. Amalgamet does not dispute this finding and indeed acknowledges Underwriters' right to realize the benefit of the Schiavone settlement.
The relevant caselaw squarely holds that once an underwriter disclaims, it may object to a subsequently-negotiated settlement with third parties only if that settlement was made in bad faith. Underwriters has not presented any evidence that the settlement with Schiavone was made in bad faith. Nor have Underwriters offered any evidence that the settlement represented less of a discount than would have been reasonable given the relative merits of the parties' positions before the AAA.[9] Accordingly, the settlement can provide no possible basis for disclaimer and Amalgamet is entitled to summary judgment striking this affirmative defense.

III. CONCLUSION
Since the Court has found that triable issues exist as to defendants' affirmative defenses based on the Weil survey, Amalgamet's representations as to the condition of the turnings and the reasonableness of Amalgamet's efforts to minimize losses, Amalgamet's motion to dismiss the affirmative defenses relating to those issues is denied as is Underwriters' motion for summary judgment based on those defenses. However, Amalgamet's motion to dismiss defendants' affirmative defense that Amalgamet breached its duty to ensure that all rights against third parties are properly preserved and exercised is granted. Accordingly, Underwriters' motion for summary judgment is denied in its entirety and Amalgamet's motion for partial summary judgment is granted in part.
SO ORDERED.
NOTES
[1] Amalgamet also secured charterer's liability insurance to cover Amalgamet's liability, if any, to third parties.
[2] References throughout are as follows: Defendant ("D."); Plaintiff ("P."); Affidavit ("Aff."); Exhibit ("Ex.").
[3] Testimony of Steven Shinn before the S.M.A. at 1195-96. P Ex. I.
[4] Nor did Underwriters disclose to Amalgamet that they might have a conflict of interest with respect to Amalgamet's claim. At the time it submitted its claims, Amalgamet claims that it was unaware that the lead underwriter of its cargo policy, Nicholas Collwyn Sturge, was also the lead underwriter on the "loss of hire" policy carried by Julianae, the vessel's owner and Amalgamet's adversary in the legal proceeding arising out of the fire. Nor did Amalgamet know that the second underwriter on Amalgamet's cargo policy was the lead underwriter on Julianae's "hull and machinery" policy. See Kleiner Aff. ¶ 19 and Exs. 8-10. Underwriters, however, alleges that there was no possible conflict of interest because "Cargo, loss of hire and hull insurance matters were and are kept completely confidential." Warner Aff. ¶ 13.
[5] The SMA also made no finding as to whether Amalgamet satisfied the cargo policy warranties, recognizing that these issues were the subject of the instant proceeding and that it would be "improper for us to prejudge the question or to prejudice whatever may transpire in that proceeding based upon the limited evidence before us." Arb. Award at 45.
[6] The Court does not render judgment at this time on Amalgamet's claim that defendants' breach of warranty defense is barred by estoppel since the evidence before it is insufficient to establish that Underwriters insisted that Amalgamet incur expenses to protect Underwriter's rights.
[7] Plaintiffs argue that a breach of the duty to mitigate is relevant only to damages, not to liability. The Court need not determine whether this argument is correct since it does not grant summary judgment on the duty to mitigate defense.
[8] "In order to recover the amount of the settlement from the insurer, the insured need not establish actual liability to the party with whom it has settled `so long as ... a potential liability on the facts known to the [insured is] shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured.]'" Luria Bros., 780 F.2d at 1091, citing Damanti v. A/S Inger, 314 F.2d 395, 397 (2d Cir.), cert denied, 375 U.S. 834, 84 S.Ct. 46, 11 L.Ed.2d 64 (1963).
[9] The general rule is that title to cargo sold "F.O.B.S.T. vessel" passes to the buyer when the goods are delivered to the ship, stowed and trimmed. It is undisputed that Schiavone loaded, stowed and trimmed the New Haven turnings after Amalgamet had inspected them, had determined them to be fit for export, and had accepted and approved them for loading. It is also undisputed that there was no explicit agreement that title to the turnings would pass at some time following their loading, stowing, and trimming. Under these circumstances, it was reasonable for Amalgamet's counsel to determine that the likelihood of prevailing before the AAA with Amalgamet's argument  that notwithstanding the general rule for passage of title, and notwithstanding Amalgamet's inspection and acceptance of the cargo, title and risk of loss did not pass because the turnings never cooled and "clean" bills of lading were never issued  was slim.