**NOVELTY TEXTILE MILLS, INC., Plaintiff,**

v.

**C.T. EASTERN, INC. d/b/a Central Transport, Defendant.**

No. 88 Civ. 8051 (BN).

United States District Court, S.D. New York.

July 18, 1990.

Hill Rivkins Loesberg O'Brien Mulroy & Hayden, New York City (George F. Chandler III, of counsel), for plaintiff.

Bondi & Iovino, New Hyde Park, N.Y. (Anthony F. Iovino, of counsel), for defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the United States Court of International Trade, sitting by designation:

### FINDINGS OF FACT

Plaintiff Novelty Textile Mills, Inc. ("Novelty") is a Connecticut Corporation with an office and place of business located at 1440 Broadway, New York, New York. Novelty is engaged in the business of manufacturing and selling specialty textiles. Defendant Central Transport ("Central") is a Michigan Corporation doing business in New York. Central is engaged in business as a common carrier transporting merchandise in interstate commerce by motor vehicle. Although jurisdiction is predicated on diversity of citizenship pursuant to 28 U.S.C. § 1332, the Court's rule of decision is drawn from 49 U.S.C. §§ 10730 and 11707 (1982 & Supp. V.1987).

Central agreed to transport certain goods—rolls of Nomex Raschel Cloth ("Nomex")—under bill of lading No. 00957 for the account of Novelty from Westmont Industries, Inc. ("Westmont") of East Stroudsburg, Pennsylvania to Point Blank Body Armor, Inc. ("Point Blank") in Freeport, New York. Novelty Invoice No. 11184 indicates 1,195 yards of the material were to be delivered to Point Blank at a price of $29.50 per yard for a total of $35,252.50. Plaintiff's Exhibit 4 ("PX n ").[1]

The bill of lading, made out by Westmont, described the cargo merely as "woven synthetic piece goods." PX 5. Significantly, Central's rate scheme under the tariff schedule provided no classification for the Nomex other than woven synthetic piece goods. Tr. 106, 112.[2] Westmont did not declare any value for the goods on the bill of lading, *see* PX 5, and neither Novelty nor Westmont ever apprised Central of the

---

1. Point Blank, upon learning the goods were damaged in transit, debited its Novelty account for the purchase price. The debit memo, however, misstates the amount owed as $33,252.50, an obvious error in arithmetic (1195 yards × $29.50 per yard = 35,252.50). PX 8.

2. Classification of the goods is important in this case because, according to defendant, in the usual course of business the shipper is required to notify the carrier of any extraordinary nature of goods being shipped. Tr. 105. This is normally done through the course of documenting the classification of the material. *Id.* at 106. Defendant contends that had it been notified of the extraordinary nature of the goods, Central would have shipped the goods "exclusively." When goods are shipped exclusively, no other goods are contained in the shipment and the shipper has responsibility for packing, sealing, loading and unloading the shipment, thus relieving the carrier of liability for any mishandling of the cargo. *Id.* at 103. Also, there is an additional freight charge for the exclusive use of the transport unit.

Defendant did not, however, provide plaintiff with any classification for the Nomex other than "woven synthetic piece goods." Moreover, as plaintiff aptly points up, Novelty was not seeking extraordinary care of the Nomex (the cloth itself was not fragile), but merely the ordinary care that most fabrics require, which sim-

extraordinary nature of the material. Tr. 61.

Defendant admits that while the fabric was in its possession a liquid contaminant spilled on the Nomex, thereby damaging the material. However, defendant contends it is not liable for the loss because: (1) plaintiff misclassified the goods on the bill of lading, *i.e.*, did not declare any value on the bill of lading, and at no time apprised defendant that the material was an expensive fabric; and (2) the goods were properly cleaned and the contaminant removed by using hot water, which eventually resulted in no damage to the material. Moreover, defendant maintains that *assuming arguendo* the material was damaged, plaintiff failed to prove that it properly mitigated damages and hence defendant should not be held liable for speculative damages.

As noted, Novelty is a manufacturer and processor of textiles. The cloth in this case, Nomex, is a flame retardant mesh material which was especially prepared by Novelty for sale to Point Blank and ultimately to the United States Army to be used as vests for tank drivers. Nomex by design is extremely difficult to cut and is, in fact, used in ballistic fabrics, "to stop a knife or bullet...." Trial Transcript at 42. ("Tr. *x* ")

Since the material was intended for use by army personnel, Novelty was required, as part of the sale to Point Blank, to supply test reports from a government approved laboratory certifying that the fabric met all military specifications. Tr. 43. It was essential that the material be flame retardant for wear by tank drivers. Indeed, the military had changed its specifications from nylon—military specification MIL–C–8061 (which sells from $4 to $5 per yard) to Nomex—military specification MIL–C–43989 (which sells for $29.50 per yard, *see* PX 1) precisely because the Nomex was flame retardant. "[P]revious vests were made of nylon and under the heat of ... fire in the tank nylon melts and it becomes like lava, and if it gets on the skin it [causes] a terrible burn and can't be taken off...." Tr. 40.

Upon receiving the material from Dupont, Novelty warped and knitted it.[3] After examining the knitted material, Novelty packaged it and sent it to the finisher where the material was scoured to remove any impurities and also heat set. The finisher, Westmont, was also a government-approved laboratory which certified that the material met all the required military specifications. Westmont processed the material and shipped it to Point Blank. Tr. 45.

During the transport from Pennsylvania to Freeport, New York, and while under the control of defendant, the goods were damaged by contact with a contaminant foreign substance, requiring the return of the goods to Westmont. Stipulated Fact 7. ("SF *n* ").

The chief dispute between the parties at this point was whether the contaminant could be safely removed. However, Central never informed Westmont, nor is it clear, that Central was aware of the exact nature of the contaminant. Arthur Feinberg, president of Novelty Textiles, testified that Central sent a letter (he was uncertain) either to Novelty or Westmont stating merely that the contaminant could easily be removed with hot water. Tr. 64.

Concerning the contaminant and proper method of cleaning the Nomex, defendant introduced the deposition testimony of John Dougherty, president of ASW Environmental Consultants, a general testing laboratory. Dougherty testified:

We tried rinsing the material with various solvents, organic solvents, which was not successful. It did not—it was not affected at all. We then took a portion of the contaminant off the material, submitted it and ran an infrared analysis on that to determine what it was.... [T]he infrared analysis indicated it was some type of polymer.... [G]iven that we tried probably one of the [best] polymer solvents which is simply water, and hot

---

ply meant keeping the fabric away from leakage in other containers.

3. Dupont is the sole manufacturer of Nomex in the United States. Tr. 40.

water took the [contaminant] off the base material with no apparent damage to the base material itself.

Tr. 93 (Deposition of John Dougherty at 7.)

Although Dougherty blandly testified that the contaminant could be removed with hot water, he could not, however, guarantee 100% removal because he had not been able to pinpoint the exact nature of the contaminant. *Id.* at 96. Furthermore, Dougherty had no idea that the base material was Nomex, although he had heard of Nomex; and neither was he aware that the base material was intended for use by the United States military nor that Nomex is supposed to be flame retardant. Without knowledge of both the base material and the contaminant, it is impossible to determine whether there has been complete removal of the contaminant from the base material. *Id.* Indeed, Dougherty further conceded that he did not test the contaminant to determine whether it was a flammable or non-flammable material. *Id.* at 96–97.

Plaintiff insists that unless 100% of the contaminant is removed, the base material would not be suitable for its intended purpose, *i.e.*, as a fire retardant tank vest, especially when the contaminant may have been itself flammable. Because Nomex is used to manufacture products that protect the lives of army soldiers, the enormous potential liability in the form of products liability and personal injury actions, plaintiff argues, would be too great to consider selling contaminated material to the Army. Tr. 4, 59–60.

Consequently, plaintiff's underwriter attempted to liquidate the goods and employed M.F. Bank & Company ("Bank"), whose business is salvage and appraisal work for insurance companies, to determine the salvage value of the contaminated fabric. Glenn H. Davis, a field representative for Bank, inspected the goods at the Westmont facility in Pennsylvania. Davis, whose experience has been eight and one half years in the appraisal business, examined the rolls and estimated that the salvage value would be very low: five to ten percent of the initial reported value of

$29.50 per yard. In a letter dated January 23, 1987 Davis explained his reasoning:

> The limited uses of this type of material along with the chemical involvement and the high-price structure makes the salvage potential of this stock very low.
>
> *   *   *   *   *   *
>
> The involved material is deemed for military use, and in this writer's [Davis'] judgment, would not pass the military's physical requirements test.

PX 10.

Davis' evaluation was corroborated by John Russo, Executive Vice President of Westmont. By letter to Novelty dated November 20, 1986 Russo stated:

> In accordance with your request, Westmont pulled a sample of damaged fabric. Under Laboratory [sic] conditions we tried to remove the unknown chemical from the fabric. Several methods were used with little success.
>
> *   *   *   *   *   *
>
> [I]f you want Westmont to rehandle these goods, we will do so; however, we will not assume any responsibility for the fabric to meet [military] test standards required or damage due to trying to remove this chemical from the Nomex.

PX 6.

Additionally, Davis sent swatches of the salvage material to potential buyers, but the best bid he received for the material was $2 per yard. Tr. 14. The reason for such a low salvage value, Davis explained, was the difficulty in cutting the fabric. Tr. 26. Because the contaminant rendered the material useless for its specialized military purpose, the fabric would have to be sold in an ordinary retail market and the few potential buyers found no use for the fabric. Tr. 28.

In a letter dated May 28, 1987 Davis submitted his final estimate of $2 per yard gross return if the goods were to be sold for the account of the insurance company. PX 12. At his deposition Davis noted the reason for the $2 salvage estimate:

> Certainly, a retailer of fabrics would have very little interest if any [ ] in the material.... I don't know of any retail-

able [sic] type clothing that is made from that fabric.. I have never seen anything like that [material].

Tr. 12. (Deposition of Glenn H. Davis. at 7.)

Because Westmont would not certify the fabric, Novelty had no recourse other than to attempt to salvage the goods, and accordingly filed a claim with its underwriter. The insurance company paid the claim in full, while retaining its rights to reimbursement under a subrogation clause. *See* PX 11 (Proof of claim and payment thereupon made upon Lloyd's of London as underwriters through its affiliate company, Toplis & Harding). Subsequently, the underwriter sold the damaged material back to Novelty at a price of $2 per yard. Tr. 53; PX 13.

Plaintiff, in turn, eventually resold the goods to an undisclosed buyer but presented scant evidence of the actual resale price. Indeed, the only evidence of the resale price is the oral testimony of Feinberg, president of Novelty. Plaintiff failed to introduce any documentary evidence, such as an invoice or bill of sale, to demonstrate to whom the goods had been sold and at what price.

Feinberg testified, and the Court finds, that based on his experience and knowledge Feinberg had "a very good idea" as to the amount for which the goods sold. Tr. 70, 76. Continuing, Feinberg stated that after the goods were contaminated, Novelty was no longer attempting to sell the material as *Nomex* but rather as ordinary mesh fabric—nylon—which normally sells for a top price of $5 per yard. Tr. 57, 76. Feinberg approximated that the goods were sold for "something around" $4 per yard, predicating his estimate on the cost of salvage, *viz.*, $2 per yard paid to the insurance company plus $1 per yard paid to Westmont to refinish the material after the goods were damaged. Tr. 76. Essentially, concluded Feinberg, "so it had to sell for more than $3 and under $5 and my guess

would be that it sold for something around $4 a yard." Tr. 76.

Notwithstanding the damaged Nomex and by using fabric already in stock, Novelty in a timely manner completed the contract for delivery of the material to Point Blank. The goods cost $24.39 per yard to manufacture, excluding overhead, and were sold to Point Blank at the contract price of $29.50. Tr. 73–74. Thus, the gross profit Novelty received on the sale was $5.11 per yard. Feinberg testified that variable costs would approximate 10% of sales *i.e.*, 10% of $29.50 equaling $2.95. Tr. 77. There was no evidence as to Novelty's fixed costs or any allocation thereof to the product in question. Subtracting overhead from the gross profit leaves plaintiff with a net profit on the sale of $2.16 per yard. Tr. 77.

Defendant contends that its tariff disallows pickup of certain goods, including crated glass, uncrated machinery, and items of high declared [extraordinary] value that would expose Central to a claim. Tr. 101. Defendant further argues, as we have seen, that had Novelty informed Central of the extraordinary value of the goods, Central would have shipped the goods exclusively [4] with a corresponding increase in the freight rate. Tr. 103. But defendant's regional manager, Leonard Squeo, admitted on cross examination that under defendant's tariff schedule, a shipper could find no classification other than "woven synthetic piece goods" pursuant to which these goods could be shipped. The short of the matter is Squeo testified that under its tariff schedule Central could not justify any increase in the freight rate for shipment of the Nomex as anything other than "woven synthetic piece goods." Tr. 112.

## CONCLUSIONS OF LAW

### I

■ Defendant mistakenly contends that because plaintiff failed to declare any value

---

**4.** When goods are shipped "exclusively," they are picked up and loaded by the shipper. The shipment is then sealed by the shipper to ensure that no other goods come into contact with the shipment and thereupon shipped to destination terminal. At the destination terminal, the shipper breaks the seal and unloads the shipment. This method of shipment prevents contamination of the goods by other materials and relieves the carrier of any liability for mishandling of the shipment. Tr. 103.

for the goods on the bill of lading or because plaintiff failed to apprise the carrier of the expensive nature of the goods, defendant cannot be held liable. The evidence does not support, and the Court is not persuaded by defendant's argument.

Under the Carmack Amendment (the "Amendment") 49 U.S.C. § 10730, "[l]imitations on liability are an exception to the general thrust of the Interstate Commerce Act placing on the carrier *absolute* liability for loss or damage of a shippers' [sic] goods." *Jones v. Yellow Freight System, Inc.*, 656 F.Supp. 550, 553 (M.D.Ga.1987) (emphasis added).[5] Formerly, a limitation on liability applied only if the bill of lading contained either the reduced freight rate or the released value of the property. *Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.*, 616 F.2d 619, 626 (2d Cir.1980), *cert. denied*, 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96.[6] More recently, in *Mechanical Technology Inc. v. Ryder Truck Lines*, 776 F.2d 1085, 1089 (2d Cir.1985), the Second Circuit held that "[w]hen a sophisticated shipper, using his own bill of lading form, leaves blank the space provided for declaring the released value of the goods, [the Court] will presume that he did so deliberately with full knowledge of the consequences under the applicable tariff." *Id.* Reversing in part the District Court decision that the carrier's liability had not been effectively limited, the Court of Appeals noted that "shippers are charged with notice of terms, conditions, and regulations contained in the tariff schedule ...," and went on to say that under the *specific facts* of that case, where the contract was "negotiated between people of at least equal

economic stature and commercial awareness," and where the shipper's "own form incorporated the applicable tariff and provided for designation of a release rate," the carrier could effectively limit its liability although the shipper had no actual knowledge of the carrier's tariff. *Ryder Truck*, 776 F.2d at 1088.

Unfortunately for defendant, the facts of this case do not fit the criteria set forth by the Second Circuit in *Ryder Truck*. While it is true that in the instant case the contract was negotiated between people of "equal economic stature and commercial awareness," and the shipper left blank its own bill of lading which incorporated the applicable tariff, it must be emphasized defendant presented no evidence that the tariff in question provided for designation of a released rate.

In *Ryder Truck* the tariff expressly provided that a failure to designate a release rate would result in a rate of $5.00 per pound. By leaving the spaces blank on the bill of lading, the Court said, the shipper "effectively selected the lowest freight rate and its corresponding low level of liability. Having had the opportunity on its own form to secure greater protection, [the shipper] 'cannot complain about the consequences of leaving the applicable spaces blank....' " 776 F.2d at 1087 (quoting *W.C. Smith, Inc. v. Yellow Freight Systems, Inc.*, 596 F.Supp. 515, 517 (E.D.Pa. 1983)).

In this case, as in *Jones*, the carrier cannot escape liability on the basis that its tariff prohibited it from carrying goods of

---

**5.** 49 U.S.C. § 10730 reads in pertinent part:

*Rates and liability based on value*

(b)(1) ... a motor common carrier providing transportation ... may, subject to the provisions of this chapter ... establish rates for the transportation of property (other than household goods) under which the liability of the carrier or freight forwarder for such property is limited to a value established by written declaration of the shipper or by a written agreement between the carrier and freight forwarder and shipper if that value would be reasonable under the circumstances surrounding the transportation.

**6.** As authorized by 49 U.S.C. §§ 10730 and 10762, carriers are required to file with the

Interstate Commerce Commission a tariff listing freight rates available to shippers. Each rate carries a corresponding level of liability, termed a release rate. The higher the freight rate, the higher the level of liability. The tariff may provide that if a shipper fails to state a release rate (as the shipper failed to do in this case), then the shipment is automatically deemed released at rate of $x$ dollars per pound. *See, e.g., Ryder Truck*, 776 F.2d at 1086; *Jones*, 656 F.Supp. at 553. Defendant presented no evidence, whatever, of an automatic release rate in its tariff in the event of the shipper's failure to declare a value on the bill of lading.

extraordinary value unless the shipper had declared a released value. Further, there was absolutely no evidence that the tariff on file in this instance contained a provision stating that the shipper automatically selected a specified released rate by not stating a declared value on the bill of lading. *See Jones,* 656 F.Supp. at 553. While acknowledging a carrier's right to know the extent of its potential liability for property damage or loss and its concomitant right to charge freights in proportion to the risk assumed, the Court will not overturn the "historic presumption that shippers are able to recover for damaged goods." *Ryder Truck,* 776 F.2d at 1088. Consequently, under the facts of this case Central's liability has not been effectively limited.

■ Moreover, defendant's contention that plaintiff somehow misclassified the goods on the bill of lading is similarly without merit. First, shippers are not required to declare value on all shipments, and it is the dispatcher who routinely inquires as to the declared value of items for shipment. Tr. 108–10. Second, Central provided no classification other than "woven synthetic piece goods," and admittedly could not justify an increase in freight under its tariff. Finally, as the following colloquy between the Court and Squeo demonstrates, Nomex was not listed in the classification bureau tariff as a high declare value item:

> Q: If I wanted to ship with [Central], how would I know that you only [accept] material that is below [$5].
> A: It would be in the classification bureau tariff, and I didn't see anything under Nomex stating that it was so high in value.... So we would take it as a woven synthetic fiber out of class 70.

Tr. 115. Plainly, then, it was defendant not plaintiff who allowed the goods to be classified as "woven synthetic piece goods."

## II

■ Defendant's next argument—that plaintiff suffered no damage because the contaminant was easily removed with hot water—is likewise without merit. Defendant's expert witness Dougherty conceded that while the contaminant could be re-moved with hot water, he could not guarantee 100% removal of the contaminant from the base material. Considering, as plaintiff aptly points out, that this material was to be used to protect the lives of army soldiers, and because Westmont had refused to certify that the material met the stringent military specifications, Novelty took the only practicable business approach it could, *i.e.,* to salvage the material. Acting otherwise would have meant exposing the company to tremendous potential liability in terms of products liability and personal injury actions. In short, Novelty had no other option available.

Defendant further insists that plaintiff has failed to prove that it properly mitigated its damages, and as a result defendant should not be held liable for speculative damages.

■ Normally, the burden of showing that a plaintiff has unreasonably failed to minimize damages rests with the wrongdoer, and in this case with defendant. *Federal Ins. Co. v. Sabine Towing & Transp. Co.,* 783 F.2d 347, 350 (2d Cir.1986); *Air Et Chaleur S.A. v. Janeway,* 757 F.2d 489, 494 (2d Cir.1985); *Amalgamet Inc. v. Underwriters at Lloyd's,* 724 F.Supp. 1132, 1140 (S.D.N.Y.1989). However, as defendant correctly maintains, "[t]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary." *United States v. N.Y., N.H. & Hartford R.R. Co.,* 355 U.S. 253, 256 n. 5, 78 S.Ct. 212, 214 n. 5, 2 L.Ed.2d 247 (1957); *see also Butler County Memorial Hospital v. Heckler,* 780 F.2d 352, 358 (3d Cir.1985); *Shatterproof Glass Corp. v. Libbey–Owens–Ford Co.,* 482 F.2d 317, 324 (6th Cir.1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473; *but see Filmline (Cross-Country) Productions, Inc. v. United Artists Corp.,* 662 F.Supp. 798, 808 n. 12 (S.D.N.Y.1987) (rejecting defendant's argument that plaintiff should bear the burden of persuasion on the issue of mitigation of damages because the evidence was provided to defendants during discovery), *aff'd,* 865 F.2d 513 (2d Cir.1989). Consequently,

in the case at bar, plaintiff bears the burden of proving that it properly mitigated damages when it resold the Nomex for $4 per yard.

■ Where mitigation of damages is at issue, the test applied to plaintiff's conduct is whether the action taken in response to the defendant's breach was reasonable. *Toyota Industrial Trucks v. Citizens National Bank,* 611 F.2d 465, 471 (3d Cir. 1979). If the course of conduct chosen by the plaintiff was *reasonable,* the plaintiff can recover despite the existence of another reasonable course of action that would have further lessened plaintiff's damages. *Federal Ins. Co. v. Sabine Towing & Transp. Co.,* 783 F.2d at 350 (emphasis added). The important question in this case, as in *Federal,* is whether the plaintiff acted reasonably in salvaging the damaged material.

■ Here, plaintiff had no choice other than to salvage the material. And as the evidence amply demonstrates, plaintiff acted in a reasonably business-like manner in its attempt to dispose of the goods. The insurance underwriter's appraiser estimated the salvage value would be very low. This evaluation was corroborated by Westmont's refusal to certify the goods. Furthermore, Davis sent swatches of the material to potential buyers but the best bid he received for the material was $2 per yard. The weight of the evidence, therefore, indicates that plaintiff justifiably and properly disposed of the goods.

■ As noted before, plaintiff presented no bill of sale or invoice—no document—to demonstrate the resale value of the damaged material. Defendant argues even if plaintiff acted in a reasonably commercial manner damages must be proved with certainty, not speculation. *Erie Conduit Corp. v. Mapa,* 102 F.R.D. 877, 880 (E.D.N.Y.1984). As observed in *Erie,* "proof of damages must rest on some foundation of actual financial data before expert testimony will be credited." *Id.; see also R.S.E., Inc. v. Pennsy Supply, Inc.,* 523 F.Supp. 954, 970 (M.D.Pa.1981).

Defendant's argument on this point is at best specious and defendant's reliance on cited case law is misplaced. While the Court finds disturbing the obvious inadequacy in plaintiff's record keeping, nevertheless such failure is not fatal to plaintiff's case. First, Feinberg testified as a fact witness, not an expert, concerning the actual resale value.[7] Hence, Feinberg's credible testimony serves as the foundation of "actual financial data." Secondly, the Supreme Court has noted a " 'clear distinction between the measure of proof necessary to establish the fact that [plaintiff] had sustained some damage, and the measure of proof necessary to enable [the Court] to fix the amount.' " *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 1792, 104 L.Ed.2d 268 (1989) (quoting

---

7. Feinberg, in fact, could qualify as an expert witness in estimating values for knit fabrics. He has been in the textile business all his life. After graduating from Textile High School in New York City, Feinberg went on to help found and later became president of the Knitted Textile Association. Tr. 37. He was chairman of the Association's Standards Committee and wrote the Raschel standards for the knitting industry published in the Textile Market Rules. Feinberg has also been retained by the United States Army Laboratories to do consulting work related to the development of military fabrics made on Raschel warp knitting machines. *Id.*

As president of Novelty, Feinberg gave a credible explanation why his company failed to present documentary proof of resale. Novelty manufactures different kinds of mesh fabric for many uses and sells to over one hundred other companies throughout the country. Because Novelty structures its files alphabetically by sales order, the only way the bill of sale could be retrieved would be if Novelty had the name of the buyer. Unfortunately, the salespersons who worked on the account (those who could identify the buyer) are no longer employed with the company and are unavailable. According to Feinberg, Novelty did search files under the account names that Feinberg thought most likely to have been involved in the resale of the damaged Nomex but to no avail.

The court finds Feinberg's sworn testimony trustworthy, concerning both the resale value of the goods ($4 per yard) and Novelty's inability to present documentary evidence related to such resale. Additionally, after having considered all the testimony and exhibits, the court finds incredulous defendant's inconceivable allegation that Novelty sold the damaged material back to Point Blank for the full purchase price of $29.50 per yard.

**220**

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). As the Supreme Court stated in *Story Parchment:*

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, *it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.* The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

282 U.S. at 563, 51 S.Ct. at 250 (emphasis added); *see also, e.g., Assurance Co. v. United States*, 813 F.2d 1202, 1205 (Fed. Cir.1987); *S.W. Electronics & Mfg. Corp. v. United States*, 655 F.2d 1078, 1088, 228 Ct.Cl. 333 (1981); *Joseph Pickard's Sons Co. v. United States*, 532 F.2d 739, 743, 209 Ct.Cl. 643 (1976). Or as the United States Court of Claims has noted:

> The ascertainment of damages ... is not an exact science, and where responsibility for damages *is* clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: "It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation."

*Electronic & Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358, 189 Ct.Cl. 237 (1969) (emphasis in original) (citations omitted).

Clearly, then, under the guidelines set forth by the Supreme Court in *Story Parchment*, plaintiff has adduced sufficient evidence under the circumstances to demonstrate that it properly mitigated damages. The credible testimony of Feinberg that the material was resold at approximately $4 per yard, the low salvage value of the damaged material given by Bank and the refusal of Westmont to certify the contaminated Nomex for Army use, all contribute to the Court's conclusion that plaintiff has proven by a preponderance of the evidence that Novelty properly mitigated the damages it suffered at the hands of defendant. As one court has succinctly observed, "[s]peculation has its place in estimating damages, and doubts should be resolved against the wrongdoer. *Olympia Equipment Leasing Co. v. Western Union Telegraph*, 797 F.2d 370, 383 (7th Cir.1986).

■ Finally, defendant logically contends that it is entitled to a reduction of the damages based on both the resale price of the material and the profit which plaintiff received in fulfilling its contract with Point Blank. As noted *supra*, the contract price between Novelty and Point Blank for the material was $29.50 per yard for 1195 yards, a total of $35,252.50. The goods cost $24.39 per yard to manufacture, excluding overhead.[8] Thus, the gross profit Novelty received on the sale was $5.11 per yard for a total of $6,106.45. Since Novelty completed its order to Point Blank, and in fact filled all it orders for the Nomex, Tr. 77, its damage award shall be reduced by such amount.

Plaintiff argues that its damage award should only be reduced by Novelty's net profit of $2.16 per yard ($5.11 − $2.95 = $2.16). However, the $2.95 per yard overhead cost (10% of $29.50 = $2.95) that Feinberg referred to consisted of variable sales costs (which are incurred per unit sale of the goods), a cost which Novelty did not adequately demonstrate it had incurred when salvaging the material. Further, plaintiff presented no evidence of any fixed

---

**8.** The yarn for the Nomex costs $27.25 per lb. It takes twelve ounces of yarn to produce one yard of fabric making the price for one yard of yarn equal to $20.44. Warping and knitting of the yarn costs $2.25 per lb. or $1.69 per yard. Freight cost to the finisher is 10 cents per yard and finishing itself is $1 per yard, totaling $23.22 per yard. The finisher adds five percent of the total for losses of the material that occur during the finishing process which is an additional $1.16 per yard, bringing the total cost per yard of the Nomex to $24.39. Tr. 74.

costs or allocation thereof to the product. As a result, plaintiff cannot now claim the benefit of costs that it never incurred.

Plaintiff resold the goods at a price of $4 per yard after having paid $2 per yard salvage to the insurance company. An additional cost of $1 per yard was paid to the finisher for refinishing the damaged goods in order for Novelty to sell them. Thus, plaintiff received a profit of $1 per yard on the resale of the goods, an amount totaling $1,195.00. Accordingly, its damage award shall be further reduced by such amount.

Under New York law, plaintiff is entitled to prejudgment interest as a matter of right, with interest accruing from October 8, 1986, the date defendant took control of and damaged the goods. N.Y.Civ. Prac.Law § 5001 (McKinney's 1963); *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 694–95 (2d Cir.1983); *Record Club of America v. United Artists Records*, 701 F.Supp. 71, 72 (S.D.N.Y.1988); *New York v. Williams*, 140 A.D.2d 836, 528 N.Y.S.2d 353 (3 Dept.1988); *Delulio v. 320–57 Corp.*, 99 A.D.2d 253, 472 N.Y.S.2d 379, 381 (1 Dept.1984) (holding there is no longer any distinction between the right to prejudgment interest on recovery for negligent versus intentional damage to property).

## CONCLUSION

Plaintiff, a manufacturer of knitted fabrics, contracted with an army supplier to provide a flame retardant mesh material (NOMEX) to be used in the manufacture of vests for United States Army tank personnel. Defendant, a common carrier, negligently damaged the goods in transport by allowing a liquid contaminant to spill on the Nomex, thus rendering the material useless for its intended military purpose. Under the Carmack Amendment, 49 U.S.C. § 10730, defendant did not effectively limit its liability. Moreover, plaintiff adduced sufficient evidence at trial to prove that its damages amounted to $27,951.05 ($35,-252.50 − [$6,106.45 + $1,195.00] = $27,-951.05). The clerk of the Court shall enter judgment in favor of plaintiff for such amount, plus prejudgment interest at the

New York statutory rate of nine percent per annum computed using simple interest. N.Y.Civ.Prac.Law § 5004 (McKinney 1981); *Long Playing Sessions v. Deluxe Labs*, 129 A.D.2d 539, 514 N.Y.S.2d 737, 738 (1 Dept.1987).[9]

The foregoing constitutes the court's findings of facts and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

---

9. Post judgment interest shall accrue at the rate set forth in 28 U.S.C. § 1961 (1988).