BEV SMITH, INC v ATWELL

Docket No. 308761. Submitted June 11, 2013, at Detroit. Decided July 18,
2013, at 9:05 a.m.

The Court of Appeals *held*:

1. An automobile is a good covered by the Uniform Commercial
Code (UCC), MCL 440.2101 *et seq.*, and the sale of the Dodge was
a transaction in goods within the meaning of MCL 440.2102. The
UCC applies to transactions in goods, including rare or antique
goods. Under article 2 of the UCC, a buyer may (1) accept goods,
MCL 440.2606; MCL 440.2607, (2) reject goods, MCL 440.2602, or
(3) revoke acceptance within a reasonable time if a nonconformity
substantially impairs the value of the goods, MCL 440.2608. In
this case, plaintiff accepted the Dodge. Pursuant to MCL
440.2607(3)(a), when a tender has been accepted, the buyer must
within a reasonable time after he or she has discovered or should
have discovered any breach, notify the seller of the breach or be
barred from any remedy. What is a reasonable time for taking any
action depends on the nature, purpose, and circumstances of the
action. The documentary evidence in this case established that the
replacement body and parts on the Dodge would have been
discoverable upon inspection of the vehicle. Even if the Dodge was
not the real and authentic Strickler Dodge, it was just as inau-

thentic at the time of purchase as when plaintiff asserts the defects were discovered. The fact that plaintiff had a full and fair opportunity to inspect the Dodge before purchasing it, and an even greater opportunity to inspect the Dodge after purchasing it, necessarily shortened the allowable period for discovering any nonconformities or inauthenticities. Under the circumstances, plaintiff's notice of breach, provided to defendant more than three years after execution of the bill of sale, was not given within a reasonable time. Consequently, the circuit court correctly ruled that plaintiff was barred from any remedy for breach of contract under MCL 440.2607(3)(a).

2. Plaintiff's claims of fraudulent misrepresentation and silent fraud essentially reiterated the allegations set forth in its breach-of-contract claim. Accordingly, plaintiff was limited to its contractual remedies under the UCC, and the trial court properly granted summary disposition in favor of defendant with respect to those claims.

3. There can be no fraud when the means of knowledge regarding the truthfulness of a representation were available to the plaintiff and the defendant did not prohibit the plaintiff from using those means. In this case, plaintiff received a binder containing numerous photographs, notes, and other documents concerning defendant's restoration of the Dodge. These documents detailed the restoration process, disclosed the presence of the replacement body, and listed many of the other replacement parts used on the vehicle. Additionally, plaintiff had a full and fair opportunity to inspect the vehicle, but did not do so. In sum, plaintiff fully possessed the means of discovering the truth or falsity of defendant's representations, and plaintiff's ability to use those means was never prohibited or impeded by defendant in any way. Rather, plaintiff was presented with the information and chose to ignore it and, therefore, could not have been fraudulently induced to enter into the transaction as a matter of law. The circuit court properly granted summary disposition in favor of defendant with respect to plaintiff's claim of fraud in the inducement.

Affirmed.

SALES — UNIFORM COMMERCIAL CODE — AUTOMOBILES — RARE GOODS — ACCEPTANCE — NOTICE OF BREACH WITHIN A REASONABLE TIME.

An automobile is a good covered by the Uniform Commercial Code (UCC), MCL 440.2101 *et seq.*; the UCC applies to transactions in goods, including rare or antique goods; under article 2 of the UCC, a buyer may (1) accept goods, MCL 440.2606; MCL 440.2607, (2)

reject goods, MCL 440.2602, or (3) revoke acceptance within a reasonable time if a nonconformity substantially impairs the value of the goods, MCL 440.2608; pursuant to MCL 440.2607(3)(a), when a tender has been accepted, the buyer must within a reasonable time after he or she has discovered or should have discovered any breach, notify the seller of the breach or be barred from any remedy; what is a reasonable time for taking any action depends on the nature, purpose, and circumstances of the action.

*Caplan & Associates, P.C.* (by *David M. Caplan*), for plaintiff.

*Butzel Long, P.C.* (by *Phillip C. Korovesis* and *Bernard J. Fuhs*), for defendant.

Before: JANSEN, P.J., and CAVANAGH and MARKEY, JJ.

JANSEN, P.J. Plaintiff appeals by right the circuit court's opinion and order of February 9, 2012, granting summary disposition in favor of defendant and dismissing plaintiff's claims with prejudice. We affirm.

I

This case arises from the sale of a rare 1965 Dodge altered-wheelbase racecar ("the Dodge" or "the vehicle"), specially manufactured by Chrysler Corporation for drag racing and use as a promotional vehicle.[1] Legendary drag racer Dave Strickler raced the Dodge during the 1965 season. The Dodge was then sold to another racecar driver, Chuck McJury, who made substantial alterations to the vehicle. Among other things, McJury replaced the vehicle's original 1965 Dodge

---

[1] It appears from the record that Chrysler built only 12 altered-wheelbase racecars in 1965. Under contract with Chrysler, the vehicles were actually converted and prepared by Detroit-area subcontractor Automotive Conversion Corporation.

Coronet body with a 1966/1967 Dodge Charger body.[2] After racing the Dodge for a short time, McJury sold it to Melvin Smith of East Galesburg, Illinois. Melvin Smith then sold the Dodge to David Fengel in 1979 or 1980. Fengel testified that the vehicle was in poor condition when he purchased it. Fengel described it as a "body shell on wheels" with "[n]o engine" and "no transmission."

Defendant purchased the Dodge from Fengel in the early 1990s for $35,000. Fengel provided defendant with documentation concerning the vehicle's history, alterations, and chain of title. In particular, Fengel provided defendant with the vehicle's original 1965 certificate of title, bearing Dave Strickler's name and address.

Defendant gathered parts and spent more than 10 years restoring the vehicle. Ted Smith, who assisted defendant in the restoration of the Dodge, testified that he and defendant relied on historical photographs, manuals, and other bulletins to guide them in the restoration process. He testified that the Dodge was meticulously restored, using as many original 1965 parts as possible. According to Ted Smith, the only reproduction parts used in the restoration were the left and right front floor panels. Ted Smith agreed that the vehicle had been restored to "Concours level" condition and that it was better than the original car. Despite the presence of the 1966/1967 Dodge Charger body that had been installed by McJury, Ted Smith believed that the restored Dodge represented "the real and authentic Strickler vehicle."

Defendant testified that when he initially acquired the Dodge, it was "very rusty" and was "missing 90

---

[2] McJury never reinstalled the vehicle's original 1965 Dodge Coronet body. The original 1965 Dodge Coronet body was apparently discarded and has never been recovered.

percent of its parts." Defendant therefore acquired a "donor car" or "parts car" from which he took various parts that were necessary to restore the vehicle. However, defendant testified that he attempted to use as many original parts as possible. To this end, defendant purchased numerous 1965 replacement parts over the years. Defendant opined that, after his restoration of the Dodge, the car was "the real and authentic Strickler vehicle."

Defendant worked with Edward Strzelecki to sell the Dodge after he had finished restoring it. In February 2007, Strzelecki sent letters to potential buyers offering the vehicle for sale and providing certain information concerning the vehicle's history, restoration, and chain of title. In one of those letters, dated February 4, 2007, Strzelecki wrote to Nicholas Smith[3] describing the vehicle as "Dave Strickler's 65 Dodge 'FACTORY' Altered Wheel-Base." Strzelecki explained that the Dodge was on loan to the Chrysler Museum in Auburn Hills, Michigan, where it was on "semi-permanent display." Strzelecki claimed in his letter that the Chrysler Museum had appraised the vehicle and had insured it for more than $2 million.[4]

Nicholas Smith considered Strzelecki to be a friend. Strzelecki gave him a binder containing extensive information and documentation pertaining to the Dodge. Among other things, the binder contained several historical photographs of the vehicle with its 1965 Dodge Coronet body, photographs of the vehicle with its subsequent 1966/1967 Dodge Charger body, documentation

[3] It appears that Nicholas Smith is an officer of plaintiff Bev Smith, Inc. Nicholas Smith is a self-described collector of classic cars.

[4] At oral argument before this Court, plaintiff's attorney asserted that, contrary to Strzelecki's representation, the Chrysler Museum does not appraise or insure the vehicles that it displays.

of the vehicle's chain of title, a handwritten note from McJury confirming that he had purchased the vehicle from Strickler, typewritten notes concerning other 1965 altered-wheelbase racecars in existence, and magazine articles concerning the Strickler car. Nicholas Smith confirmed that he had reviewed the contents of the binder before agreeing to purchase the Dodge from defendant.

"[W]hen it looked like the transaction might happen," Nicholas Smith traveled to Michigan and went to the Chrysler Museum with Strzelecki to personally inspect the vehicle. He walked around the vehicle at the Chrysler Museum but remained "outside of the rails that protected the car from visitors." According to Nicholas Smith, defendant represented "on more than one occasion" that "all of the original parts were used in the [restoration] project."

As soon as plaintiff decided to purchase the Dodge, the parties entered into negotiations concerning the consideration to be paid. Plaintiff ultimately agreed to give defendant $600,000 in cash, plus two other classic automobiles in exchange: (1) a 1964 Dodge Coronet Hemi Super Stock valued at $278,000, and (2) a 1964 Ford Thunderbolt valued at $250,000. On March 29, 2007, the parties executed the following bill of sale[5]:

BILL OF SALE

Steve Atwell hereby agrees to sell and Bev Smith Ford agrees to purchase the Dave Strickler 1965 Dodge AWB[6] drag car, VIN W151191681. Seller represents this vehicle to be the real and authentic Strickler car, that he (Atwell) is the true owner of the car, and further that no liens or encumbrances exist against the vehicle.

---

[5] Nicholas Smith signed the bill of sale on behalf of plaintiff.

[6] "AWB" means "altered wheelbase."

It is agreed that Smith will pay Atwell the sum of $600,000.00 (six hundred thousand dollars) plus two vehicles as described herein. Smith represents these two vehicles to be authentic and free of any liens or encumbrances.

1. 1964 Dodge Coronet Hemi Super Stock (color red), VIN 6142229092

2. 1964 Ford Thunderbolt (color white), VIN 4F41K230520.

Smith agrees to provide Atwell first opportunity to purchase the Strickler vehicle in the event Smith elects to re-sell it. Atwell likewise agrees to provide Smith first opportunity to repurchase the Thunderbolt and/or 64 Dodge. As part of this buy-sell agreement, the parties agree that the previous sale of the 1964 Dodge Hemi Super Stock (color black), V[IN] 6142227884 becomes final.

Atwell will be responsible for removing the Strickler car from the Chrysler Museum at a future date to be mutually agreed upon. Coincidently, the car will be delivered by Atwell to an agreed upon site and, at Atwell's expense, brought to good mechanical and running condition.

It is hereby stated and understood that this transaction will not be valid until funds and titles have changed hands.

After plaintiff accepted delivery of the vehicle, Nicholas Smith altered the Dodge in certain respects according to his own preferences and took the vehicle to various car shows. At a classic car event in Ohio in July 2008, a car historian informed Nicholas Smith that the Dodge had a "donor body" and was not the "real" Strickler car. Nicholas Smith subsequently spoke with McJury, who informed him that Strickler's original 1965 Dodge Coronet body had been discarded. Another expert, Mike Guffey, informed Nicholas Smith sometime in the fall of 2008 that the Dodge had relatively few original parts. Defendant testified that he could not recall whether or not he had told plaintiff that the vehicle had its original 1965 body.

On April 20, 2010, plaintiff's attorneys in Florida sent a letter to defendant that stated in pertinent part:

> [Plaintiff] has learned that the Strickler Car it purchased from you is in fact not the "real and authentic" vehicle driven by Dave Strickler in the 1960s, as you expressly represented and warranted during the sale and in the Contract. [Plaintiff] now knows that the vehicle was re-bodied and otherwise restored using predominantly non-original and reproduction parts. [Plaintiff] would never have purchased the Strickler Car if it knew the vehicle was not the "real and authentic" vehicle as promised.
>
> As a result of your material misrepresentations regarding the authenticity and restoration of the Strickler Car, [plaintiff] has suffered and continues to suffer substantial damages. . . . Stated simply, you exploited the authenticity and restoration of the Strickler Car to fraudulently gain a profit from [plaintiff].
>
> Your false misrepresentations and warranties regarding the restoration and authenticity of the Strickler Car are all actionable under the law . . . .
>
> *  *  *
>
> Attached please find the lawsuit which [plaintiff] intends to file against you. . . .
>
> If you would like to discuss resolving this matter to avoid litigation prior to [plaintiff] filing this lawsuit, please contact us within ten (10) days after your receipt of this letter. If we do not hear from you within 10 days of your receipt of this letter, this lawsuit will immediately be filed against you.

On September 28, 2010, plaintiff commenced this action in the Oakland Circuit Court. Plaintiff alleged that it had discovered that the Dodge was reconstructed chiefly with replacement parts and, accordingly, that it was not "the real and authentic Strickler car" as

defendant had represented in the bill of sale. Plaintiff set forth claims of breach of contract (count I), fraud in the inducement (count II), fraudulent misrepresentation (count III), and silent fraud (count IV).[7]

During discovery, defendant and Strzelecki admitted that they had used more than 200 replacement parts in the restoration of the Dodge. Strzelecki confirmed that the Dodge, as restored by defendant, did not have the original chemically milled body[8] from 1965. In addition, Ted Smith testified that very little of the original 1965 Dodge Coronet had been used and that numerous replacement parts were taken from a donor car. Ted Smith testified that many of the original parts were discarded because they were too rusty or in poor condition.

Galen Govier, an expert on altered-wheelbase racecars, inspected the Dodge. Govier opined that less than 15 percent of the original 1965 Dodge Coronet had been retained and that the body, engine, transmission, and rear axle were not "correct for a 1965 Dodge." James Schild, an expert on classic automobile restoration, testified that the restored Dodge was a "[r]econstruction" and that it had been "re-bodied." Because the vehicle had an entirely different body, Schild testified that "it cannot possibly be the real and authentic [Strickler] car . . . ."

William Stiles testified that he "built Dave Strickler's altered wheelbase car" in 1965. Stiles asserted that he had refused to authenticate the restored Dodge because

---

[7] Plaintiff also claimed that defendant had breached the contractual right of first refusal by reselling the 1964 Ford Thunderbolt to a third party without first offering it to plaintiff or giving plaintiff notice of his intent to sell (count V). This claim is not at issue in the present appeal.

[8] The original 1965 Dodge Coronet body was treated with acid to reduce the thickness and weight of the metal.

it was "not the car I built." According to Stiles, defendant "built a car to look like the original car. . . . But it's not the original car." Stiles opined that defendant should have used whatever remained of the original Dodge, even if it was in poor condition and required significant patching, and should not have used so many replacement parts. Stiles did not believe that the restored Dodge was collectible because it was no longer the original Strickler racecar.

On January 11, 2012, defendant moved for summary disposition pursuant to MCR 2.116(C)(10), asserting that there was no genuine issue of material fact for trial, that plaintiff had waived any claim concerning the vehicle's authenticity by waiting too long to sue, and that plaintiff could not have reasonably relied on any misrepresentations by defendant as a matter of law. According to defendant, it was readily apparent at the time of purchase that the vehicle had been restored using certain replacement parts and did not have the original 1965 Dodge Coronet body. Defendant contended that Nicholas Smith, a sophisticated car collector, should have immediately noticed these alterations. Defendant also contended that plaintiff had a full and fair opportunity to inspect the vehicle or retain an expert to inspect the vehicle, but had failed to do so before purchasing it. Defendant argued that because plaintiff had waited until April 20, 2010, to notify him of any alleged breach relating to the authenticity of the vehicle, plaintiff was barred from any remedy pursuant to MCL 440.2607(3)(a).

With respect to plaintiff's fraud claims, defendant argued that it was unreasonable as a matter of law for plaintiff to rely on any warranties or representations outside the four corners of the bill of sale. In addition, defendant argued that there could be no fraud in this

case because the means to discover the true nature of the vehicle were at all times available to plaintiff. Defendant further contended that plaintiff's fraud claims were barred by the economic loss doctrine.

Following oral argument, the circuit court issued an opinion and order granting summary disposition in favor of defendant and dismissing plaintiff's claims with prejudice. The court ruled that it was beyond genuine factual dispute that plaintiff had waited too long to notify defendant of any alleged breach relating to the vehicle's authenticity. Thus, the court concluded that any remedy for breach of contract was barred by MCL 440.2607(3)(a). With respect to plaintiff's fraud claims, the court ruled that plaintiff could not have justifiably relied on any alleged misrepresentations by defendant because it had for itself the means to discover the truth. Specifically, the court noted that defendant had provided plaintiff with a full and fair opportunity to inspect the Dodge prior to its sale, but that plaintiff had chosen not to inspect the vehicle. Further, the circuit court remarked that plaintiff's fraud claims were based entirely on economic injury, and related exclusively to the quality or character of the good sold. Thus, the court ruled, they were barred by the economic loss doctrine.

II

We review de novo the circuit court's grant or denial of a motion for summary disposition. *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998). "Summary disposition is proper under MCR 2.116(C)(10) if the affidavits and other documentary evidence show that there is no genuine issue concerning any material fact and that the moving party is entitled to judgment as a matter of law."

*Kennedy v Great Atlantic & Pacific Tea Co*, 274 Mich App 710, 712; 737 NW2d 179 (2007). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

Whether the Uniform Commercial Code (UCC) applies in a particular case is a question of law that we review de novo. *Heritage Resources, Inc v Caterpillar Fin Servs Corp*, 284 Mich App 617, 632; 774 NW2d 332 (2009). "When interpreting a uniform act, such as the Uniform Commercial Code, it is appropriate for this Court to look for guidance in the caselaw of other jurisdictions in which the act has been adopted." *Id.*

In general, "[t]he question whether a [party] may be a merchant as that term is used in the U.C.C. is a question of law for the courts to decide by applying the U.C.C. definition of merchant to the facts in the case." *Milwaukee Co v Northrop Data Systems, Inc*, 602 F2d 767, 771 (CA 7, 1979); see also *Vince v Broome*, 443 So 2d 23, 28 (Miss, 1983) (noting that "[t]he ultimate question of whether a person comes within the definition of merchant is a mixed question of law and fact"). But when there are no disputed material facts, the question whether a party is a merchant under the UCC should be decided on summary disposition as a matter of law. See *Hammer v Thompson*, 35 Kan App 2d 165, 184; 129 P3d 609 (2006); see also *Moll v Abbott Laboratories*, 444 Mich 1, 28 n 36; 506 NW2d 816 (1993) (stating that "[t]he law does not oblige a trial judge to sit idle and present the issue to a jury when the undisputed facts support but one conclusion").

Whether a reasonable time has elapsed is generally a question for the trier of fact. *Moore v First Security Cas*

*Co*, 224 Mich App 370, 379; 568 NW2d 841 (1997). If reasonable minds could not differ, however, the question of what constitutes a reasonable time should be decided on summary disposition as a matter of law. *Computer Network, Inc v AM Gen Corp*, 265 Mich App 309, 322; 696 NW2d 49 (2005); see also *Moore*, 224 Mich App at 379.

III

As a preliminary matter, we hold that defendant's sale of the Dodge must be evaluated under article 2 of the Uniform Commercial Code (UCC), MCL 440.2101 *et seq.* An automobile is a "good" covered by the UCC, MCL 440.2105(1); see also *Whitcraft v Wolfe*, 148 Mich App 40, 50; 384 NW2d 400 (1985), and defendant's sale of the Dodge to plaintiff unquestionably constituted a "transaction[] in goods" within the meaning of MCL 440.2102.

Plaintiff contends that the UCC should not be applied in this case because the transaction was merely a sale to a private collector and was not "commercial" in nature. We disagree with this contention. It does not matter to our analysis that the Dodge was sold to a private collector or that the sale was not quintessentially commercial in nature. The UCC indisputably applies to transactions in goods, including rare or antique goods, between private collectors. See, e.g., *Bander v Grossman*, 161 Misc 2d 119, 120-122; 611 NYS2d 985 (1994) (applying the UCC to the sale of a collectible Astin-Martin automobile); *Sundlun v Shoemaker*, 421 Pa Super 353, 356, 359-361; 617 A2d 1330 (1992) (applying the UCC to the sale of a rare, antique clock); *Wilson v Hammer Holdings, Inc*, 850 F2d 3, 4-6 (CA 1, 1988) (applying the UCC to the sale of artwork to private collectors); *N Bloom & Son (Antiques) Ltd v*

*Skelly*, 673 F Supp 1260, 1262, 1265-1266 (SD NY, 1987) (applying the UCC to the sale of an antique emerald and diamond necklace to a private buyer).

IV

We also hold that plaintiff was not a "merchant" within the meaning of the UCC for purposes of the transaction at issue. A "merchant" is "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." MCL 440.2104(1).[9] It is true that Nicholas Smith described himself as a serious collector of classic cars. However, plaintiff did not purchase the Dodge in furtherance of its trade and did not specifically hold itself out as possessing specialized knowledge or skill concerning classic automobiles.[10] Nor does the success of plaintiff's business depend on collecting classic racecars. Plaintiff is akin to a hobbyist and purchased the Dodge merely for pleasure. Cf. *Nelson v Union Equity Co-op Exchange*, 548 SW2d 352, 357 (Tex, 1977).

V

Plaintiff argues that the circuit court erred by concluding that it was beyond genuine factual dispute that

[9] Michigan's UCC was recently amended. This opinion cites the statutes in effect when the circuit court decided this case, including MCL 440.2104(1), amended effective July 1, 2013, by 2012 PA 87.

[10] Because plaintiff was not a merchant, the transaction at issue in this case was not "between merchants" as defined by MCL 440.2104(3).

it failed to provide notice of the alleged breach of contract to defendant within a reasonable time. We disagree.

In general, under article 2 of the UCC, a buyer may (1) accept goods, MCL 440.2606; MCL 440.2607, (2) reject goods, MCL 440.2602, or (3) revoke acceptance within a reasonable time if a nonconformity substantially impairs the value of the goods, MCL 440.2608.[11] It is undisputed that plaintiff accepted the Dodge in this case. This occurred, at the very latest, shortly after the bill of sale was executed and plaintiff had taken possession of the vehicle, when Nicholas Smith altered the Dodge in certain respects according to his own preferences. See MCL 440.2606(1)(c).

MCL 440.2607(3)(a) provides that when a tender has been accepted "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]"[12] Accordingly, the salient question is whether plaintiff notified defendant of the alleged breach of contract within a reasonable time. "What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action." MCL 440.1204(2);[13] see also *Kelynack v Yamaha Motor Corp, USA*, 152 Mich App 105, 113; 394 NW2d 17

----

[11] "Although their legal effects are the same, rejection and revocation of acceptance differ in the circumstances under which each may be employed. Rejection occurs before the goods are accepted and is permitted where the tender fails 'in any respect to conform to the contract.' Revocation of acceptance, on the other hand, can take place only after the goods have been accepted and only where their 'nonconformity substantially impairs [their] value to him (the buyer).' " 2 Hawkland, Uniform Commercial Code Series, Sales, § 2-608:2, p 124 (citations omitted).

[12] "The burden is on the buyer to establish any breach with respect to the goods accepted." MCL 440.2607(4).

[13] MCL 440.1204(2) was amended effective July 1, 2013, by 2012 PA 86. The relevant statutory language is now located at MCL 440.1205(1).

(1986) (observing that "[w]hat is a reasonable time for taking any action depends on the nature and circumstances of the case").

The particular breach of contract alleged by plaintiff in this case pertains to the authenticity of the Dodge. Specifically, plaintiff asserts that it discovered sometime in the summer or fall of 2008 that the Dodge was not "the real and authentic Strickler car" as represented by defendant in the bill of sale. Plaintiff repeatedly asserts that the vehicle's replacement body and numerous replacement parts were difficult to detect and that this lengthened the time necessary to discover the alleged breach. But the documentary evidence presented in this case overwhelmingly establishes that the replacement body and parts would have been easily discoverable upon inspection of the vehicle. Indeed, plaintiff admits that it was given documents at the time of sale describing how McJury had replaced the vehicle's body and enumerating the numerous replacements parts used during the vehicle's restoration. Plaintiff also admits that defendant afforded it a full and fair opportunity to inspect the vehicle before the bill of sale was executed. There is simply no evidence to indicate that the vehicle's alleged inauthenticity was latent or otherwise hidden from plaintiff's view.

We need not definitively resolve whether the vehicle was "the real and authentic Strickler car" as represented in the bill of sale because plaintiff had ample time and opportunity to discover the claimed inauthenticities. Even if the Dodge is not "the real and authentic Strickler car," it was just as inauthentic at the time of purchase as it was when Nicholas Smith claims to have discovered the defects in the summer or fall of 2008. "Because of the static nature of authenticity," plaintiff was no less capable of discovering the inauthenticities

at the time of purchase than it was at a later time. *Wilson*, 850 F2d at 6. Moreover, plaintiff easily could have discovered any problems related to the vehicle's genuineness at the outset, by means of an inspection or an expert appraisal. See *id.* at 7; see also *Krahmer v Christie's Inc*, 903 A2d 773, 781-782 (Del Ch, 2006). It is beyond dispute that any lack of authenticity would have been "readily apparent to the trained eye of an [automotive] expert." See *Rosen v Spanierman*, 894 F2d 28, 32 (CA 2, 1990).

The fact that plaintiff had a full and fair opportunity to inspect the Dodge prior to purchasing it, and an even greater opportunity to inspect the Dodge after purchasing it, necessarily shortened the allowable period for discovering any nonconformities or inauthenticities. See 2 Hawkland, Uniform Commercial Code Series, Sales, § 2-608:5, p 167. For purposes of UCC § 2-607(3)(a),[14] "[q]ualities that are apparent . . . reasonably should be inspected and complained of soon after the goods . . . have been delivered . . . ." *P & F Constr Corp v Friend Lumber Corp of Medford*, 31 Mass App 57, 60; 575 NE2d 61 (1991). Yet plaintiff did not notify defendant of the purported breach until April 20, 2010, when its attorneys in Florida sent a letter complaining that the Dodge was "not the 'real and authentic' vehicle driven by Dave Strickler in the 1960s . . . ." In other words, plaintiff did not notify defendant of the purported breach of contract until more than three years after purchasing the vehicle and approximately three years after receiving the vehicle from defendant. We hold that plaintiff's notice of breach, provided to defendant more than three years after the execution of the bill of sale, was not given within a reasonable time. See *Mich Sugar Co v Jebavy-Sorenson Orchard Co*, 66 Mich App 642, 647; 239 NW2d 693 (1976).

---

[14] MCL 440.2607(3)(a).

Plaintiff should have discovered any alleged breach of contract relating to the authenticity of the Dodge shortly after purchasing it. Even viewing the admissible evidence in the light most favorable to plaintiff, reasonable minds could not conclude that plaintiff notified defendant of the alleged breach "within a reasonable time after [it] discover[ed] or should have discovered any breach" as required by MCL 440.2607(3)(a).[15] Consequently, the circuit court correctly ruled that plaintiff was "barred from any remedy" for breach of contract, MCL 440.2607(3)(a); see also *Jones v Linebaugh*, 34 Mich App 305, 310-311; 191 NW2d 142 (1971), and properly granted summary disposition in favor of defendant with respect to plaintiff's breach-of-contract claim.[16]

VI

We further conclude that the circuit court properly dismissed plaintiff's claims alleging fraud in the inducement, fraudulent misrepresentation, and silent fraud.

---

[15] We note that the timeliness of a buyer's notice of breach under MCL 440.2607(3)(a) does not depend on a showing of prejudice to the seller. *Eaton Corp v Magnavox Co*, 581 F Supp 1514, 1532 (ED Mich, 1984).

[16] The "reasonable time" allowed for revocation of acceptance under MCL 440.2608(2) is generally longer than the "reasonable time" allowed for notice of breach under MCL 440.2607(3)(a). See Official Comment 4 to UCC § 2-608 (noting that "the reasonable time period [for revocation of acceptance] should extend in most cases beyond the time in which notification of breach must be given, beyond the time for discovery of non-conformity after acceptance and beyond the time for rejection after tender"). Plaintiff does not specifically argue that it revoked its acceptance of the vehicle under MCL 440.2608. Lest there be any confusion, however, we conclude that because plaintiff could have discovered the Dodge's replacement body and numerous replacement parts upon reasonable inspection, plaintiff would not have been entitled to revoke its acceptance of the vehicle after three years. See MCL 440.2608(2); see also MCL 440.2608(1)(b); *Colonial Dodge, Inc v Miller*, 420 Mich 452, 459; 362 NW2d 704 (1984) (observing that, in order to justify a buyer's revocation of acceptance, a nonconformity must "be difficult to discover").

Plaintiff's claims of fraudulent misrepresentation and silent fraud essentially reiterated the allegations set forth in plaintiff's breach-of-contract claim. The gravamen of these two claims was that defendant misled plaintiff by affirmatively representing that the restored Dodge was "the real and authentic Strickler car" and by failing to disclose the extensive use of replacement parts. But these claims alleged nothing extraneous to the contractual dispute. The fraudulent representations alleged by plaintiff pertained exclusively to the quality and authenticity of the Dodge. These representations were indistinguishable from defendant's representation in the contract that the vehicle was "the real and authentic Strickler car . . . ." Defendant's alleged nondisclosures likewise pertained solely to the authenticity and genuineness of the Dodge. Accordingly, plaintiff was limited to its contractual remedies under the UCC, and the circuit court properly granted summary disposition in favor of defendant with respect to plaintiff's claims of fraudulent misrepresentation and silent fraud. *Huron Tool & Engineering Co v Precision Consulting Servs, Inc*, 209 Mich App 365, 374-375; 532 NW2d 541 (1995).

We acknowledge that the economic loss doctrine does not bar claims of fraud in the inducement when one party's ability to negotiate fair terms and make an informed decision has been undermined by the other party's fraudulent behavior. See *id*. at 372-373. However, "there can be no fraud where the means of knowledge regarding the truthfulness of the representation are available to the plaintiff and the degree of their utilization has not been prohibited by the defendant." *Webb v First of Mich Corp*, 195 Mich App 470, 474; 491 NW2d 851 (1992). As explained previously, plaintiff received a binder containing numerous photographs, notes, and other documents concerning defen-

dant's restoration of the Dodge. These documents detailed the restoration process, disclosed the presence of the replacement 1966/1967 Dodge Charger body, and listed many of the other replacement parts used on the vehicle. Additionally, plaintiff had a full and fair opportunity to inspect the vehicle, but did not do so. In sum, plaintiff fully possessed the means of discovering the truth or falsity of defendant's representations, and plaintiff's ability to utilize these means was never prohibited or impeded by defendant in any way. See *id.* Quite simply, plaintiff was "presented with the information and chose to ignore it," *Mable Cleary Trust v Edward-Marlah Muzyl Trust*, 262 Mich App 485, 501; 686 NW2d 770 (2004), overruled on other grounds by *Titan Ins Co v Hyten*, 491 Mich 547 (2012), and therefore could not have been fraudulently induced to enter into the transaction as a matter of law. The circuit court properly granted summary disposition in favor of defendant with respect to plaintiff's claim of fraud in the inducement.

Affirmed. As the prevailing party, defendant may tax costs pursuant to MCR 7.219.

CAVANAGH and MARKEY, JJ., concurred with JANSEN, P.J.